**2021 UT App 110**

## THE UTAH COURT OF APPEALS

TAYLOR LYNN SCOTT,
Appellee,
*v.*
SARAH CATHERINE BENSON,
Appellant.

Opinion
No. 20210280-CA
Filed October 21, 2021

Third District Court, Salt Lake Department
The Honorable Richard D. McKelvie
No. 194903038

G. Clayton Randle, Benjamin Lusty, Julie J. Nelson,
and Alexandra Mareschal, Attorneys for Appellant

Jeremy G. Jones and Jeffrey C. Jensen, Attorneys
for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and JILL M. POHLMAN
concurred.

HARRIS, Judge:

¶1     In this case, we must consider whether Taylor Lynn Scott
has parental rights, pursuant to the terms of the Utah Uniform
Parentage Act (the Act), with respect to a child (Child) with
whom he shares no biological connection. Under the rather
unique circumstances of this case, the district court determined
that he does, despite being party to an admittedly fraudulent
voluntary declaration of paternity. Sarah Catherine Benson,[1]

———————————————————

1. The appellant has since married and, in the record, is referred
to variously by both her current and former surnames. For ease

(continued…)

Child's biological mother, appeals that determination. For the reasons discussed herein, we affirm.

BACKGROUND[2]

¶2 Scott and Benson began dating in late 2011. At that time, Benson was already pregnant with Child, and Scott was aware of that when he and Benson began their relationship. It is therefore undisputed that Scott is not Child's biological father.

¶3 Over the next few months, the couple's relationship deepened, and they moved in together and became engaged to be married. When Benson gave birth to Child in the spring of 2012, Scott attended the delivery, helped care for Benson and Child at the hospital, and then upon discharge transported Benson and Child to the couple's joint residence. Child's biological father passed away shortly after Child's birth, and Scott assumed a paternal role thereafter in many meaningful ways, at least for the first few years of Child's life.

¶4 Later in 2012, Benson became pregnant with Scott's biological child (Sibling), who was born in 2013. About a month prior to Sibling's birth, Scott and Benson ended their relationship. After the birth, Benson initiated a paternity action

_____

(…continued)

of reference, and intending no disrespect, we refer to the appellant as Benson, in a manner consistent with the case caption.

2. In this case, which comes to us after an evidentiary hearing to the bench, "we view the evidence in a light most favorable to the [district] court's findings, and therefore recite the facts consistent with that standard." *See Linebaugh v. Gibson*, 2020 UT App 108, ¶ 3 n.5, 471 P.3d 835 (quotation simplified).

regarding Sibling (but not Child), in which she sought to establish that Scott was Sibling's father and to require him to pay child support. The parties eventually reached an agreement to resolve that action; as part of the settlement, Scott and Benson both executed a voluntary declaration of paternity regarding Sibling. Under the agreement, which was reflected in a court order, Scott enjoyed significant parent-time with Sibling, starting with six out of every fourteen overnights but eventually transitioning into an equal parent-time arrangement. At least according to Scott (whose account was to some extent disputed by Benson), the parties often proceeded as though both children were subject to the same custody arrangement, even though the existing court order applied only to Sibling. That is, for a period of several years, Scott often cared for Child on similar terms as he cared for Sibling, and this informal arrangement continued even after Scott married someone else in 2015.

¶5     In December 2017, Benson was arrested and charged with driving under the influence of alcohol. She eventually entered a guilty plea, and as a result her driving privileges were suspended for a time. In the wake of these events, Benson asked Scott to temporarily take primary custody of Child and Sibling and, for the next several months, Scott and his spouse acted as the primary caregivers to both children. During this time, Benson struggled with depression and suicidal thoughts, and began to consider what would happen to the children should she no longer be able to care for them. The parties discussed the possibility of signing a voluntary declaration of paternity regarding Child as they had for Sibling, and eventually they agreed to do so. In March 2018, they both executed such a declaration (the VDP), therein making certain representations "under penalty of perjury." In that document, Benson checked a box averring that she "believe[d]" Scott was "the biological father" of Child, and Scott checked a box averring that he "believe[d]" he was "the biological father" of Child. These

averments were factually incorrect when made, and both parties knew it.

¶6      For about a year after executing the VDP, the parties continued their informal co-parenting arrangement with regard to both children. But in March 2019, Benson—who had since married and whose spouse apparently wanted to adopt Child—began denying Scott access to Child. Just a few weeks later, Scott filed the instant paternity action, seeking among other things a judicial declaration that he was Child's legal father and an order granting him joint legal and physical custody over Child. In response, Benson not only opposed Scott's petition, but also filed a counter-petition challenging Scott's paternity, specifically alleging that the VDP was fraudulent.

¶7      Soon after filing her counter-petition, Benson filed a motion asking the court to compel Scott to submit to genetic testing, which she asserted would conclusively demonstrate that Scott was not Child's biological father. Scott responded by conceding that he was not Child's biological father, but nevertheless asked the court to disregard that fact pursuant to a specific provision of the Act, *see* Utah Code Ann. § 78B-15-608 (LexisNexis 2018) (herein referred to as "Section 608"), and apply principles of estoppel and equity to prevent Benson from contesting his status as Child's legal father. At a hearing regarding Benson's motion for genetic testing, the parties stipulated that Scott was not Child's biological father, thereby obviating the need for formal genetic testing.

¶8      Later, Benson filed a motion for summary judgment asking the court to set aside the VDP because the parties had made a "material mistake of fact," a term that in this context is statutorily defined to include a situation in which "genetic test results . . . exclude a declarant father." *See id.* § 78B-15-307(5). The court denied the motion by relying on the "normal and usual application and definition" of mistake: "a conscious choice

made on incorrect information or an unconscious choice." In the court's view, there could not have been a "mistake" of fact, because the parties knew that Scott was not Child's biological father at the time they signed the VDP.

¶9 Following denial of Benson's summary judgment motion, the court held a three-day evidentiary hearing to consider Benson's challenge to the validity of the VDP, and to consider Scott's request for application of Section 608. In support of his position, Scott called seven witnesses, including himself as well as various family members and care providers. In brief summary, Scott's witnesses testified that Scott was, for all intents and purposes, Child's father, that he and Child had a strong bond of attachment, and that Scott was an attentive and involved father who had shared roughly equal custody of Child over the preceding years. Scott also admitted to falsely executing the VDP.

¶10 In support of her position, Benson called six witnesses, including herself, her spouse, various family members, and a child psychologist. In brief summary, Benson's witnesses acknowledged that Scott had played some role in caring for Child, but downplayed the scope of that role, offering their view that Scott was inconsistent in his supporting role and that he was not a father figure to Child. Benson acknowledged that she had voluntarily and fraudulently signed the VDP, but explained that she did so during one of the "lowest parts" of her life, a time when she "honestly believed that [she] was going to end [her] life," and was concerned that Child would in that event be placed into foster care and be separated from Sibling. She testified that she no longer wanted Scott to play a part in Child's life, and that she believed that outcome to be in Child's best interest.

¶11 After the hearing concluded, the court took the matter under advisement, and later issued a written ruling. The court

accepted the parties' stipulation that Scott was not Child's biological father, and found that the parties knew that fact when they signed the VDP; as a consequence, the court found that the VDP suffered from two infirmities. First, the court partially reconsidered its summary judgment ruling and concluded that, given the statutory definition of "material mistake of fact," *see id.*, the parties had been operating under such a mistake when they signed the VDP. Second, the court found that both parties signed the VDP voluntarily, without coercion or duress, and therefore could not have defrauded each other, but nevertheless found that the VDP "was based on fraud" because its effect was to commit a "fraud against the Utah State Division of Vital Statistics."

¶12    On those two independent bases, the court sustained Benson's challenge to the VDP. In its next sentence, the court stated: "Given those restrictions, the Court must conclude and does conclude that the [VDP] is void *ab initio*, and has no legal force or effect." The court offered no reasoning or explanation for its conclusion that the consequence of Benson's successful challenge was that the VDP was void from its inception.

¶13    Despite concluding that the VDP was void, the court then proceeded to analyze Scott's request—made pursuant to Section 608—that the court ignore the genetic evidence in the case, based on principles of estoppel, equity, and Child's best interest, and nevertheless declare Scott to be Child's legal father. On this score, the court found in Scott's favor, making extensive factual findings in support of its determination. First, the court found Scott to be "particularly credible," especially his "description of his relationship with" Child; the court stated that it had "no reservations regarding the genuine nature of [Scott's] relationship with and affection for" Child. And while the court found Benson to be "generally credible," the court did "not accept . . . her characterization of [Scott's] early relationship with" Child, finding that Benson's account was "against the

weight of other testimony." Based largely on those credibility assessments, the court found that Scott "exclusively played [the] role" of father "for the first 7 years" of Child's life, and that Benson "intended [Scott] to play [that] role," even "turn[ing] the primary care of both children over" to Scott after her DUI. Second, the court "reject[ed] . . . in its entirety" the testimony of Benson's spouse, finding that his "testimony was crafted in whatever way he believed it would be most helpful to [Benson], regardless of its truth." Third, the court "reject[ed]" Benson's claim that she signed the VDP under duress, or that Scott forced her to sign it, and specifically found that Benson signed the VDP because she "was concerned about [Child's] future in the event something happened to her, and she wanted to make sure [Child] had someone who would care for him," and that Scott had "willingly filled that role." Fourth, the court found that Benson had "removed" Child from Scott's life in 2019 "simply because it suited her interests to do so," rather than out of any concern about Child's best interest.

¶14   Based on these factual findings, the court concluded that Benson's conduct "estop[ped] [her] from denying the parentage of [Scott]," and that "[i]t would be inequitable to disrupt the father-child relationship between [Child] and [Scott], the declarant father." The court then analyzed a long list of factors—including the strong bond between Scott and Child, the fact that Child's biological father had passed away, and the fact that Scott and Benson have another child together—and concluded that "it is in the best interest[] of [Child] that [Scott] be legally established as his father." On that basis, the court ordered that the stipulated genetic facts—that Scott was not Child's biological father—"are disregarded," and declared Scott "to be the legal father of [Child]." The court left for another day the questions of custody, parent-time, and child support.

¶15   Later, the district court certified its parentage order as final and reviewable pursuant to rule 54(b) of the Utah Rules of

Civil Procedure. Benson then appealed from that order, and this court—due to questions regarding the propriety of the rule 54(b) certification—considered Benson's appeal to be a petition for permission to appeal an interlocutory order, and granted that petition. *See* Utah R. App. P. 5(a).

ISSUE AND STANDARD OF REVIEW

¶16   Benson's appellate challenge is limited. In particular, Benson mounts no challenge to any of the district court's factual findings. Instead, Benson challenges only the court's interpretation of Utah's paternity statutes, asserting that, because the VDP was procured by fraud, and because the court concluded that the VDP was void ab initio, Scott could not have been considered a "declarant father" and therefore Section 608 has no application. Questions of statutory interpretation are questions of law; we review a district court's statutory interpretation decisions for correctness, affording them no deference. *See State v. Outzen*, 2017 UT 30, ¶ 5, 408 P.3d 334.

ANALYSIS

¶17   We begin our analysis with a general discussion of the Act, and in particular its provisions governing both the establishment of, and challenges to, parental rights by declaration of paternity. Following this general discussion, we address the two specific arguments Benson raises in her challenge to the district court's parentage order: that Scott was not a "declarant father" under the Act, and that the court's declaration that the VDP was "void ab initio" operated to erase Scott's status as a parent. For the reasons discussed, we find Benson's arguments unpersuasive.

A

¶18    Parents' rights to raise their children are fundamental, and constitute some of the most important rights our society observes. *See Troxel v. Granville*, 530 U.S. 57, 65 (2000) ("The liberty interest . . . of parents in the care, custody, and control of their children [] is perhaps the oldest of the fundamental liberty interests recognized by this Court."); *see also In re adoption of J.S.*, 2014 UT 51, ¶ 57, 358 P.3d 1009 (stating that "parental rights are significant and traditionally respected"). But before such rights are entitled to respect, they must first be established. There are a number of different ways for a parent to establish a recognized parent-child relationship, many of which are based on the notion that parents should generally have parental rights regarding their biological children. *See Lehr v. Robertson*, 463 U.S. 248, 256–57 (1983) (recognizing "[t]he intangible fibers that connect parent and child"); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (holding that a biological father's interest "in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest," constitutional protection).

¶19    In most cases, parental status is established, based on an assumed biological connection, simply by presumption of circumstance. For instance, a mother-child relationship is established whenever a woman not party to a valid gestational agreement gives birth to a child, *see* Utah Code Ann. § 78B-15-201(1)(a)(i) (LexisNexis 2018), and a father-child relationship is established by statutory presumption whenever a child is born during a marriage, *see id.* §§ 78B-15-201(2)(a), -204(1)(a). Even outside a marriage, a father's "biological connection" to his child offers him "an opportunity that no other male possesses to develop a relationship with his offspring." *See Lehr*, 463 U.S. at 262; *see also In re Baby Girl T*, 2012 UT 78, ¶ 18, 298 P.3d 1251 (stating that "an unwed biological father" may acquire parental rights if he "demonstrates a full commitment to the

responsibilities of parenthood by coming forward to participate in the rearing of his child" (quotation simplified)).

¶20 But there are ways, under the law, for individuals to acquire parental rights even without any biological connection to the child. Adoption is the most obvious example. *See* Utah Code Ann. § 78B-15-201(1)(a)(iii), -201(2)(d). Section 608—although it is not as commonly invoked as the adoption process—provides another example. *See generally id.* § 78B-15-608. That statutory section gives district courts the opportunity, in two specific factual situations, to disregard genetic facts and apply principles of estoppel, equity, and best interest to leave an established parental relationship intact—even if challenged—despite the established absence of any genetic connection.[3] The first situation—involving a man who is married to a woman at the time of the child's birth, and is thus presumed to be the child's father, but is later proved not to be the child's genetic father—is not present in this case, and therefore not at issue in this appeal. *See id.* §§ 78B-15-607, -608.

¶21 The second situation—the one at issue here—involves "declarant fathers": men who establish parental rights through the execution of a voluntary "declaration of paternity." *See id.*

---

3. Not all states that have enacted a version of the Uniform Parentage Act have included a provision like Section 608 in their statute. As of 2013, and "[c]ounting the states that have adopted the provisions of the 2002 [Uniform Parentage Act], eighteen allow courts to refuse to set aside a . . . [declaration of paternity] based on estoppel or the child's best interests, or both, but the remainder do not." *See* Leslie Joan Harris, *Reforming Paternity Law to Eliminate Gender, Status, and Class Inequality*, 2013 Mich. St. L. Rev. 1295, 1324–25 (2013). Our legislature's decision to include Section 608 in the Act, even when some other state legislatures have determined not to, is of significance here.

§§ 78B-15-301, -302. Acquiring parental rights in this way requires the consent of the child's mother; both the mother and the declarant father must sign a declaration, under penalty of perjury and in front of witnesses, and must make several representations. *See id.* § 78B-15-302(1). Specifically, they must aver that the child in question has no other adjudicated, declarant, or presumed father, and that the man's claim of paternity is not inconsistent with any completed genetic testing. *Id.* § 78B-15-302(1)(d), (e). If a "valid" and "effective" declaration of paternity is filed with the Office of Vital Records, then a "father-child relationship is established" between the child and the declarant father, and "all of the rights and duties of a parent" are "confer[red] upon the declarant father." *Id.* §§ 78B-15-201(2)(b), -304(3), -305(1). "For the purposes of establishing paternity, a voluntary declaration of paternity, duly signed and filed, has the same effect as a judicial determination of paternity." *In re S.H.*, 2005 UT App 324, ¶ 15, 119 P.3d 309.

¶22 The facts before us establish that the VDP Scott and Benson filed with the Office of Vital Records in March 2018 met all the basic statutory requirements, and was therefore "valid" and "effective" when submitted.[4] The VDP was executed by both

---

4. Benson asserts that the VDP was not "valid" or "effective," even though it met the basic statutory requirements, because the court declared it to be void ab initio and because Scott did not meet the definition of "declarant father." We address—and reject—the merits of those arguments below, *see infra* Part B, but more to the point, those arguments do not necessarily go to whether a declaration of paternity is "valid" or "effective" at the time it is filed. A declaration is valid and effective if it meets all the basic statutory requirements and is accepted by the Office of Vital Records. Of course, any such declaration may later be challenged under any one of several statutory avenues. *See, e.g.,* Utah Code Ann. §§ 78B-15-302(3), -306, -307 (LexisNexis 2018).

(continued…)

Scott and Benson, under penalty of perjury and in front of witnesses. Scott and Benson both represented that Child had no other adjudicated, presumed, or declarant father. Most importantly for present purposes, both claimed—falsely, as it turned out—that they "believe[d]" Scott was Child's biological father. And they filed the document in the proper place with the proper state agency. Thus, the VDP was valid and effective, and Scott's status as Child's parent, with all its concomitant rights and duties, was established in or about March 2018. Soon thereafter, Scott and Benson amended Child's birth certificate to list Scott as Child's father, and they operated under that arrangement—with Scott as Child's established legal father—for approximately a year.

¶23    Voluntary declarations of paternity are, however, subject to challenge. Within the first sixty days, either signatory to a declaration of paternity may rescind it, without specifying any reason. *See* Utah Code Ann. § 78B-15-306 (LexisNexis 2018). After the rescission period has ended, however, a signatory may challenge a declaration of paternity "only on the basis of fraud, duress, or material mistake of fact." *Id.* § 78B-15-307(1) (herein referred to as "Section 307"). Benson's challenge was raised more than a year after the VDP was filed, and thus was brought under Section 307. The district court sustained that challenge, finding both fraud and material mistake of fact in the execution of the VDP. Scott does not contest those findings here, and for the purposes of this appeal we consider it established that the VDP was indeed infirm for the reasons found by the district court.

---

(…continued)

But it does not necessarily follow, merely from a successful later challenge, that a declaration was not "valid" or "effective" when submitted.

¶24   Nevertheless, after sustaining Benson's challenge to the VDP, the district court proceeded, at Scott's request, to apply the analysis set forth in Section 608. That statutory section states that, "[i]n a proceeding to . . . challenge the paternity of a child having a declarant father, the [court] may . . . disregard genetic test results that exclude the . . . declarant father if the [court]" makes three independent factual determinations. *See id.* § 78B-15-608(1).[5] First, the court must determine that "the conduct of" one of the signatories to the declaration (here, Benson) "estops that party from denying parentage." *Id.* § 78B-15-608(1)(a). Second, the court must determine that "it would be inequitable to disrupt the father-child relationship between the child and the . . . declarant father." *Id.* § 78B-15-608(1)(b). Third, the court must find that disregarding the genetic facts is in "the best interest of the child." *Id.* § 78B-15-608(2). If the court makes the necessary findings, and determines to disregard the genetic facts, "it shall issue an order adjudicating the . . . declarant father to be the father of the child." *Id.* § 78B-15-608(3). As noted, the court made the necessary findings, disregarded the genetic facts, and declared Scott to be Child's legal father. Benson does not challenge any of the court's factual findings.

¶25   Because Scott does not challenge the district court's findings regarding fraud and mutual mistake of fact, and because Benson does not challenge the court's findings regarding estoppel, equity, or best interest, the question raised in this appeal is a narrow legal one: was the district court correct to

---

5. In this case, there were no "genetic test results," because the parties stipulated—after the filing of Benson's motion seeking to compel Scott to submit to genetic testing—that Scott was not Child's biological father. Like the district court, we consider Section 608's reference to "genetic test results" to be broad enough to include genetic facts that are arrived at by stipulation; neither party asks us to adopt a contrary interpretation.

even proceed to apply Section 608, after sustaining Benson's Section 307 challenge?

¶26    Benson asserts that Section 608 has no application here, and that the court erred by proceeding to engage with its principles after sustaining her Section 307 challenge. In support of her position, Benson makes two arguments. First, she asserts that Scott was not a "declarant father" under the statutory definition of that term, and therefore Section 608—which applies only to cases involving "presumed fathers" or "declarant fathers"—does not apply. Second, she notes that the district court declared the VDP to be "void ab initio," and asserts that this declaration rendered the VDP null and void from the outset, erasing Scott's status—if he ever had such status—as a declarant father. We address each of Benson's arguments, in turn.

B

¶27    The Act provides a statutory definition of "declarant father," proclaiming that the term, as used in the statute, "means a male who, along with the biological mother claims to be the genetic father of a child, and signs a voluntary declaration of paternity to establish the man's paternity." Utah Code Ann. § 78B-15-102(8) (LexisNexis 2018). Benson acknowledges that she and Scott both signed a voluntary declaration of paternity. But she contends that Scott does not meet the statutory definition of "declarant father" because, in her view, he does not "claim[] to be the genetic father" of Child. In support of this position, Benson makes two arguments.

¶28    First, she contends that, because Scott stipulated during this case that he was not Child's genetic father, and because he knew all along that he was not Child's genetic father, Scott does not "claim[]" to be Child's genetic father. But the statute does not require Scott to have *always* claimed he was Child's genetic father; indeed, many (if not most) Section 307 challenges will involve situations in which the putative declarant father, at the

time the litigation is ongoing, has come to realize that he is not actually the genetic father of the child in question. In this case, Scott undoubtedly made at least one formal claim—at the time of the filing of the VDP—that he was Child's genetic father. In that document, he averred under penalty of perjury that he "believe[d]" he was "the biological father of" Child. In our view, a man has "claimed" to be the genetic father of a child, for purposes of the statutory definition of "declarant father," if the man files a declaration of paternity in which he avers that he believes himself to be the genetic father.

¶29    Second, Benson asserts that the word "claim," as used in the statutory definition of "declarant father," means that the man needed to have made a good-faith claim—rather than a knowingly fraudulent claim—of genetic paternity. The paternity statute does not provide a definition of "claim." *See generally id.* § 78B-15-102. Where a statute does not provide an internal definition of a term, we "interpret the statutory language according to the plain meaning of its text." *See O'Hearon v. Hansen*, 2017 UT App 214, ¶ 24, 409 P.3d 85 (quotation simplified); *see also In re adoption of Baby E.Z.*, 2011 UT 38, ¶ 15, 266 P.3d 702 (instructing courts to "assume the legislative body used each term . . . in accordance with its ordinary meaning" (quotation simplified)). "A starting point for a court's assessment of ordinary meaning is the dictionary." *O'Hearon*, 2017 UT App 214, ¶ 25 (quotation simplified). Benson supplies us with a dictionary definition of the word "claim," but that definition does not support her position. *See Claim*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/claim [https://perma.cc/J5P7-MHWG] (stating that "claim" means "to say something is true or is a fact, although you cannot prove it and other people might not believe it"). And other dictionaries we have consulted likewise do not define the word "claim" to necessarily include a good-faith state of mind. *See, e.g.*, *Claim*, Webster's Third New Int'l Dictionary 414 (2002) (defining "claim" as follows: "to assert especially with conviction and in

the face of possible contradiction or doubt"); *Claim*, Black's Law Dictionary (11th ed. 2019) ("A statement that something yet to be proved is true."). In our view, the word "claim"—as generally used in common parlance—includes both good-faith claims and bad-faith claims. If our legislature had intended a specialized definition of the term "claim" that incorporated only good-faith claims, it could have so indicated. *Cf. Belnap v. Howard*, 2019 UT 9, ¶¶ 10–11, 437 P.3d 355 (declining to read a bad-faith exception into a rule of civil procedure when the rule's language was clear and did not include one). We therefore reject Benson's assertion that the word "claim," as used in the Act's definition of "declarant father," refers only to good-faith claims.[6]

---

6. Finally, and in a related vein, Benson asserts that the overall statutory scheme—and not just the use of the word "claim" in the definition of "declarant father"—set out in the Act indicates legislative intent to cabin that definition to exclude men who knowingly lied in executing a declaration of paternity. She points to requirements specifying that only a "valid" and "effective" declaration of paternity operates to give a man parental rights, but she overlooks the fact—discussed *supra* ¶ 22 and note 4—that the VDP in this case was valid and effective, for about a year, because it met all statutory requirements and was filed properly. And she speculates that Scott's interpretation of "declarant father" would operate to "circumvent" Utah adoption law, but we consider that speculation overheated. *See infra* ¶ 41. In short, we are aware of no provision in the Act that indicates legislative intent to limit the term "declarant father" to only those men who make a good-faith (as opposed to bad-faith) claim of genetic paternity. As discussed elsewhere herein, had our legislature intended that result, it could have used a different definition of "claim," or it could have expanded the bases upon which a declaration of paternity is considered void. *See* Utah Code Ann. §§ 78B-15-102(8), -302(3). It did not do so,

(continued…)

¶30 Thus, because he claimed to be Child's genetic father, and executed a valid declaration of paternity to that effect, Scott met the Act's definition of "declarant father." *See* Utah Code Ann. § 78B-15-102(8).

C

¶31 Second, Benson asserts that, even if Scott could be considered a "declarant father," pursuant to the statutory definition of that term, at the time the VDP was filed, any such status was effectively erased when the district court declared the VDP to be void ab initio for fraud. We take Benson's point and acknowledge that, if the VDP actually were void ab initio, her argument would perhaps have merit; indeed, a father whose declaration of paternity never took effect, and who is by court order placed back into his pre-declaration position, cannot be considered to have acquired parental rights under the Act. But in our view the court had no basis to declare the VDP void, and used the term "void ab initio" ill-advisedly. As we interpret the Act, a declaration of paternity that is successfully challenged only under Section 307, without invoking the other statutory grounds for voidness or rescission, is not void ab initio but, instead, is subject to being declared ineffective on a forward-looking basis.

---

(…continued)

even though it has, in other contexts, indicated an ability and willingness to distinguish between good-faith and bad-faith claims. *See, e.g.*, *id.* § 63A-5b-606(4) (LexisNexis Supp. 2021) (setting forth penalties for "fraudulent" or "bad faith claim[s]" in procurement cases); *id.* § 78B-5-825 (2018) (allowing an award of attorney fees to the prevailing party "if the court determines that the action or defense to the action was without merit and not brought or asserted in good faith").

¶32    We begin our analysis by examining the Act as a whole, and by discussing the various ways in which a declaration of paternity can be challenged. We find it significant that the drafters of the Act specified certain circumstances—and only those circumstances—in which a declaration of paternity can be considered "void" or subject to "rescission." *See* Utah Code Ann. §§ 78B-15-302(3), -306. When we view those statutory provisions in tandem with Section 307, we conclude that there is no statutory basis for concluding that a declaration of paternity is void simply because a Section 307 challenge is successful.

¶33    The Act specifies that a "declaration of paternity is void if" any one of three circumstances is present. *See id.* § 78B-15-302(3) (herein referred to as "Section 302(3)"). First, a declaration is void if it states that another man—other than the male signatory—is a presumed father, unless that other man has filed a valid denial of paternity. *Id.* § 78B-15-302(3)(a). Second, a declaration is void if it states that "another man is a declarant or adjudicated father." *Id.* § 78B-15-302(3)(b). Third, a declaration is void if it "falsely denies the existence of a presumed, declarant, or adjudicated father." *Id.* § 78B-15-302(3)(c). These are the only circumstances in which the Act commands that a declaration be considered void. No other circumstances are listed.[7] And none of the listed circumstances are present in this case. Child's biological father passed away soon after his birth, and there is no other adjudicated, presumed, or declarant father with regard to Child. Presumably for these reasons, Benson has not argued—either before the district court or on appeal—that the VDP should be considered void under Section 302(3).

---

7. We note that, if our legislature had intended for declarations of paternity to be considered void in which one of the signatories made a knowingly false claim regarding genetic paternity, it could have easily added a fourth circumstance to Section 302(3).

¶34 Another section of the Act (Section 306) provides signatories the opportunity to seek rescission of declarations of paternity, for no reason or any reason, as long as they do so within a certain specified time period. *See id.* § 78B-15-306(1). The specified time period is short, ending no later than sixty days after the declaration's effective date. *See id.* As with the word "claim," the Act does not provide a specialized definition of "rescission," so we apply the usual and ordinary meaning of the word. *See O'Hearon*, 2017 UT App 214, ¶ 24. As customarily used, the term "rescission" means that parties to a contract are put "back into the positions they would have held had no contract ever existed." *See* Howard O. Hunter, Modern Law of Contracts § 12:18 (2021); *see also Rescission*, Black's Law Dictionary (11th ed. 2019) (stating that rescission is the "unmaking of a contract" and its effect is to "restor[e] the parties to their precontractual positions"); 17A Am. Jur. 2d *Contracts* § 536 (2021) (stating that rescission "has the effect of voiding a contract from its inception, as if it never existed"). Thus, Section 306, by its purposeful use of the term "rescission," provides an additional avenue, over and above the circumstances set forth in Section 302(3), for declaring a declaration of paternity invalid from its inception. But Benson missed the deadline for availing herself of Section 306's remedy; she did not seek rescission within sixty days of the VDP's effective date in March 2018. Presumably for this reason, Benson has not argued—either before the district court or on appeal—that she has a right to seek rescission of the VDP pursuant to Section 306.

¶35 A party to whom Section 302(3) does not apply and for whom the Section 306 deadline has passed must look to Section 307 for grounds to challenge a declaration of paternity. *See* Utah Code Ann. § 78B-15-307(1) (stating that, "[a]fter the period for rescission under [Section 306] has expired, a signatory of a declaration of paternity . . . may commence a proceeding to challenge the declaration . . . only on the basis of fraud, duress,

or material mistake of fact"). Section 307 is the provision Benson invoked in her counter-petition, and the provision the court applied in evaluating that counter-petition. As noted, the court concluded that Benson's Section 307 challenge had merit because the VDP was entered into fraudulently and subject to a material mistake of fact. Scott does not challenge that determination; therefore, for our purposes, there is no question that Benson's challenge to the VDP under Section 307 was successful.

¶36 The central question presented here concerns the consequence of a successful Section 307 challenge. The district court, upon sustaining Benson's challenge, proclaimed the VDP to be "void ab initio" and without "legal force or effect," but offered no explanation supporting this declaration; the court appeared to simply assume that the consequence of a successful Section 307 challenge was that the VDP would be declared void. The parties offer divergent views regarding the court's declaration. Benson centers her argument around it, and asserts that the effect of the declaration is to erase any "declarant father" status Scott may at one point have enjoyed. But Benson does not offer any basis for the court's declaration that the VDP was void; Scott, for his part, asserts that the court should not have declared the VDP void. After examining the Act as a whole, we see no basis for the court to have declared the VDP void ab initio.

¶37 As a starting point, we note that no provision anywhere in the Act dictates that a VDP subject to a successful Section 307 challenge is void ab initio. *See generally id.* §§ 78B-15-301 to -313, 601 to -623.[8] Certainly, Section 307 itself is silent regarding the

---

8. We are also unaware of any case law, in Utah or elsewhere, interpreting the language of Section 307 in this way. In her brief, Benson cites two cases from other jurisdictions that she asserts stand for this proposition, but they do not. *See McGee v. Gonyo*, 2016 VT 8, 201 Vt. 216, 140 A.3d 162; *Alvarado v. Thomson*, 375

(continued…)

consequences of a successful challenge. *See id.* § 78B-15-307. The extent of specific statutory guidance on this point comes from the next section, which mandates that, "[a]t the conclusion of a proceeding to rescind or challenge a declaration of paternity . . . , the [court] shall order the Office of Vital Records to amend the birth record of the child, if appropriate." *Id.* § 78B-15-308(5).

¶38    But the Act's silence on this point must be viewed in tandem with the specific instructions given for successful challenges pursuant to Section 302(3) or Section 306. *See Bryner v. Cardon Outreach, LLC,* 2018 UT 52, ¶ 10, 428 P.3d 1096 (stating that appellate courts "read the plain language of [a] statute as a whole, and interpret its provisions in harmony with other statutes in the same chapter and related chapters" (quotation simplified)).[9] As noted, our legislature set forth only three

---

(…continued)
P.3d 77 (Ariz. Ct. App. 2016). Those cases stand merely for the proposition that a declaration of paternity in which both signatories participate in the fraud can still be set aside for fraud, even though the signatories did not defraud each other. In those cases, however, the courts simply set aside the fraudulent declarations and did not deem them void. *See McGee,* 2016 VT 8, ¶ 19; *Alvarado,* 375 P.3d at 80. Thus, neither of those cases takes the extra step Benson is asking us to take here, namely, to hold that a fraudulent declaration of paternity renders the declaration void ab initio and prevents any further evaluation of parentage based on equity, estoppel, and best interest.

9. Most of Benson's assertions that other sections of the Act support her position are unpersuasive. But one of Benson's arguments is more intriguing. She points out that section 78B-15-617 of the Utah Code (Section 617), which sets forth "[r]ules for adjudication of paternity," has a provision stating as follows: "Unless the results of genetic testing are admitted to rebut other

(continued…)

specific situations in which a declaration of paternity is to be considered "void," none of which applies here. *See id.* § 78B-15-302(3). And our legislature set forth an additional set of circumstances in which signatories may rescind a declaration of paternity, an eventuality which renders the declaration void from its inception. *See* Utah Code Ann. § 78B-15-306. Thus, our

---

(…continued)

results of genetic testing, a man properly excluded as the father of a child by genetic testing must be adjudicated not to be the father of the child." *See* Utah Code Ann. § 78B-15-617(4) (LexisNexis 2018). And she also points out that another subsection of Section 617 contains similar language, but expressly references Section 608 as a potential exception to its rule: "Unless the results of genetic testing are admitted to rebut other results of genetic testing, a man identified as the father of a child under Section 78B-15-505 must be adjudicated the father of the child, *unless an exception is granted under* [*Section 608*]." *Id.* § 78B-15-617(2) (emphasis added). Benson asserts that the legislature's inclusion of a potential Section 608 exception in subsection (2), coupled with its omission of a similar potential exception in subsection (4), means that a father who is excluded by genetic testing can never be adjudicated to be the legal father of a child. In our view, however, Benson's argument proves too much; if it were correct, Section 608—which exists only to give courts an opportunity to disregard genetic evidence in appropriate circumstances—would be effectively excised from the Act. We acknowledge the apparent inconsistency between subsections (2) and (4) of Section 617, but we do not perceive therein a legislative intent to abrogate Section 608. However, because our conclusions on this point—as well as on other points elsewhere in this opinion—are based on statutory interpretation, our legislature is of course free to express disagreement with our conclusions, by legislative amendment, in the event it believes we have not correctly perceived its intent.

legislature took pains to specify certain circumstances in which a declaration of paternity is to be considered void, and it elected not to so specify with regard to Section 307 challenges. When interpreting a statute, we "seek to give effect to omissions in statutory language by presuming all omissions to be purposeful." *Belnap*, 2019 UT 9, ¶ 27 (quotation simplified); *see also McKitrick v. Gibson*, 2021 UT 48, ¶ 37 (stating that "the expression of one term should be interpreted as the exclusion of another" (quotation simplified)). Here, we must assume the legislature's choice—not to proclaim as "void" those declarations of paternity that have been successfully challenged under Section 307 alone—to have been purposeful, especially given the legislature's specificity, in other sections of the Act, regarding circumstances in which declarations should be considered void.

¶39    Moreover, if the effect of a successful Section 307 challenge were to render a declaration of paternity void ab initio, the reach of Section 608 would be extremely limited. Section 608 applies whenever (i) there exists a presumed or declarant father, and (ii) a party challenges the paternity rights of the presumed or declarant father based on genetic facts that "exclude the presumed or declarant father." *See* Utah Code Ann. § 78B-15-608(1). Many successful Section 307 challenges—including challenges that are successful on grounds of mutual mistake of fact—will fit these criteria. But if Benson's argument were correct—and the consequence of any successful Section 307 challenge were determined to be that the declaration of paternity were void ab initio—many situations that fit Section 608's simple criteria would not be eligible for consideration under Section 608, because the declaration would be void from the outset. In short, Benson's argument sweeps too broadly.

¶40    On this basis, although we affirm the district court's ultimate conclusions, we conclude that its use of the term "void ab initio" was unsupported by statute, and was in this context

ill-advised.[10] The consequence of a successful Section 307 challenge—at least one that does not invoke Section 302(3) or Section 306—is not that the declaration of paternity is rendered void from its inception; instead, under the statutory scheme viewed holistically, the consequence of such a challenge is that a declaration will be set aside, on a going-forward basis, so long as Section 608 does not counsel otherwise. *See* Leslie Joan Harris, *Reforming Paternity Law to Eliminate Gender, Status, and Class Inequality*, 2013 Mich. St. L. Rev. 1295, 1323–24 (2013) (analyzing Utah's version of the Uniform Parentage Act, comparing it with other states' versions, and stating that, under Utah's law, "genetic test results that exclude a man who signed" a declaration of paternity "allow" that declaration "to be set aside . . . because the man is not the biological father unless the court invokes the estoppel and best-interests principles"); *see also G.R.B. v. L.J.B.*, 260 So. 3d 833 (Ala. Civ. App. 2018) (applying Alabama's version of Section 608 to reverse a trial court's determination disestablishing paternity for a declarant father who willingly filed a fraudulent declaration of paternity and operated as father for ten years, and remanding for evaluation of whether to disregard genetic testing using Section 608's equity, estoppel, and best interest factors).

¶41　And although we view this result as driven by the statutory text, we briefly discuss—and reject as unpersuasive—the policy considerations Benson advances. In her view, the result we reach here today will encourage fraud, and will allow scheming parties to circumvent Utah's adoption statutes. As Benson sees it, our interpretation of the Act would allow "a man

---

10. Indeed, we wonder whether the court intended to use the term in the same way Benson now advocates, given that the court did not believe that the effect of its use of the term was to foreclose review under Section 608. After all, immediately after using the term, the court proceeded to engage with Section 608.

who knows he is not the genetic father" to "collude with the mother to fraudulently sign" a declaration of paternity and thereby "conceal the child's existence from the genetic father long enough to establish a parental relationship with the child, and then use [S]ection 608 to prevent the genetic father from replacing him." But Benson ignores the fact that Section 302(3) already accounts for this scenario, at least to some extent, making plain that any declaration that "falsely denies the existence of a presumed, declarant, or adjudicated father" is "void." *See* Utah Code Ann. § 78B-15-302(3)(c). And in any event, we have a hard time believing that courts asked to apply Section 608 would find—absent truly extraordinary circumstances—that the equities tip in a man's favor in cases where a true genetic father exists and the man tried to conceal the child from the genetic father.

¶42 Moreover, as at least one other jurist has pointed out, the equitable and policy considerations surrounding Section 608 start to look different if one envisions a different factual circumstance: a situation in which a declarant father who executed a knowingly fraudulent declaration of paternity later attempts to use Section 307 to escape his established parental obligations—as opposed to, as here, use Section 608 to retain his established parental rights—when he, for instance, comes into a large amount of money and no longer wishes to pay child support. *See McGee v. Gonyo*, 2016 VT 8, ¶ 25, 201 Vt. 216, 140 A.3d 162 (Robinson, J., dissenting) (discussing a scenario in which a "putative father had held himself out to the world as the child's parent for years, but then sought to sever his legal obligations because he won the lottery and wanted to avoid paying increased child support"); *see also G.R.B.*, 260 So. 3d at 833 (applying Alabama's version of Section 608 to potentially hold a father to the parental obligations he voluntarily assumed in a fraudulently executed declaration of paternity). For reasons best known to itself, our legislature chose to adopt Section 608 as part of the Act, even when many other state legislatures opted

not to; with this factual situation in mind, we can envision sound policy reasons that might have motivated that choice. And in any event, our task is not to second-guess that choice, but rather to give voice to that choice by interpreting the Act according to the ordinary meaning of its text.

## CONCLUSION

¶43    In this case, other than using the term "void ab initio" when it shouldn't have, the district court acted in a procedurally appropriate manner, and interpreted the Act correctly. The court properly began its analysis by assessing whether the VDP was subject to challenge under Section 307, and determined that it was, for both mutual mistake of fact and for fraud. After sustaining Benson's Section 307 challenge, the court then correctly transitioned into an analysis—at Scott's request—under Section 608, to assess whether to ignore the genetic facts of the case based on principles of estoppel, equity, and best interest. And as noted, the court's factual findings in that regard are unchallenged.

¶44    For these reasons, we affirm the district court's parentage order, and remand the case for further proceedings regarding, among other things, custody, parent-time, and child support.

———————