2023 UT App 3

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF J.E.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

D.E.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20210921-CA
Filed January 20, 2023

Third District Juvenile Court, Salt Lake Department
The Honorable Annette Jan
No. 1198329

D.E., Appellant Pro Se

Sean D. Reyes, Carol L.C. Verdoia, and John M.
Peterson, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

Julie J. Nelson, Debra M. Nelson, Alexandra
Mareschal, and Kirstin Norman, Attorneys for
Amicus Curiae Utah Indigent Appellate
Defense Division

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGES
GREGORY K. ORME and MICHELE M. CHRISTIANSEN FORSTER
concurred.

HARRIS, Judge:

¶1      D.E. (Father) obtained—at least for a while—parental
rights regarding J.E. (Child) when he and Child's mother (Mother)
duly signed and filed a voluntary declaration of paternity (the

VDP). Later, however, genetic testing revealed that Father is not Child's biological father. Based on those test results, the guardian ad litem (the GAL) appointed to represent Child raised a challenge to the VDP, which the juvenile court sustained, later issuing an order invalidating the VDP and declaring it "void."

¶2     Father now challenges that order, asserting that the GAL (on behalf of Child) had no right under applicable law to challenge the VDP. We first determine that we have jurisdiction to consider Father's appeal. And on the merits, we conclude that the juvenile court correctly determined that, under the circumstances presented here, Child has statutory standing to challenge the VDP. On that basis, we affirm the court's decision to reach the merits of Child's challenge and to sustain that challenge. But the court should not have declared the VDP "void," and we remand for correction of the language used in the court's order and for such other proceedings as might be appropriate.

BACKGROUND[1]

¶3     In 2021, Father and Mother were residing together—but not married—with three children: then-one-year-old Child and his two older siblings. All three children are Mother's biological children, and Father's paternity had been established as to the older two children. At the time, both Mother and Father were uncertain whether Father was the biological father of Child, because they were both aware that Mother had engaged in sexual activity with both Father and another man in 2019, around the time Child had been conceived. But neither Father nor any other man had established paternity with regard to Child.

---

1. "We recite the facts in a light most favorable to the juvenile court findings." *In re K.J.*, 2013 UT App 237, ¶ 2 n.2, 327 P.3d 1203 (quotation simplified).

¶4 In early 2021, Father was arrested and charged with aggravated assault involving domestic violence, as well as commission of domestic violence in front of a child, related to an incident in which Mother accused him of attempting to smother her with a pillow in front of the children. The charging document labeled Father a "habitual violent offender," explaining that he had previously been convicted of domestic violence against Mother in connection with a 2019 incident. Father remained incarcerated on these new charges for several weeks. Mother also obtained a civil protective order against Father, which remained in effect for several months, until she asked for it to be dismissed.

¶5 A few weeks after Father's arrest, Mother was arrested and incarcerated on charges of drug possession. Mother later admitted that she had been using methamphetamine. At that point, the Department of Child and Family Services (DCFS) filed a petition seeking custody of the children, and the court granted that request at a subsequent shelter hearing.

¶6 A month later, in May 2021, Mother remained incarcerated—she was eventually released in August—but Father had been released from jail after the criminal charges against him were dismissed. The record before us does not disclose the reasons for the dismissal of the criminal case, but the dismissal occurred on the date set for preliminary hearing, and it was entered without prejudice. Neither the State nor the juvenile court viewed the dismissal of the criminal charges as an exoneration of Father; indeed, the court eventually scheduled an evidentiary hearing to consider whether Father had committed domestic violence against Mother and, at the conclusion of that hearing, found that all three children were "neglected by" Father.

¶7 After his release from jail, Father requested that the children be returned to his custody. The court denied that request, but did order that Father be allowed supervised visitation with at least some of the children.

¶8 At another hearing a couple of weeks later, the GAL first raised the issue of Child's paternity, and asked that the court order genetic testing to determine whether Father was indeed Child's biological father. Neither Father nor Mother opposed this request, and the court therefore ordered that genetic testing take place, an order that necessarily required that Father, Mother, and Child all separately submit to genetic testing.

¶9 On August 5, 2021, Father submitted a biological sample for genetic testing. Mother and Child, however, did not submit biological samples until August 19. On August 18, the day before Mother and Child submitted their samples, Father and Mother signed and filed the VDP. On that form, they both swore that they "believe[d]" that Father was Child's biological father. And Father answered "no" to a question asking whether "the birth mother, child, and biological father" had "submitted to genetic testing." The Utah Office of Vital Records and Statistics accepted the VDP as valid, and that same day issued an amended birth certificate for Child, listing Father as Child's father.

¶10 Following the filing of the VDP, Father (through counsel) filed a motion seeking visitation with Child, alleging that DCFS had been "not allowing" him to have visitation because the GAL "is opposed to the visits." The GAL filed a response that asked the court to postpone its decision on visitation with Child until the results of the genetic testing were known. In that same opposition memorandum, the GAL raised a challenge to the VDP, specifically invoking sections 78B-15-302 and -307 of the Utah Code. In particular, the GAL asserted that Father had fraudulently answered some of the questions on the VDP, and asserted that, if the pending genetic testing excluded Father as Child's biological father, the VDP could also be challenged on the ground that there had been a material mistake of fact. In reply, Father asserted that the VDP, which had been accepted by the Office of Vital Records and Statistics, gave him parental rights as Child's father, and that he was therefore entitled to visitation. He also requested a hearing regarding the GAL's challenge to the VDP.

¶11   In late September 2021, while Father's motion for visitation was pending, the genetic test results came back and demonstrated that Father is *not* Child's biological father.

¶12   Eventually, the court held an evidentiary hearing to consider Father's motion for visitation. At that hearing, the court heard brief testimony, under oath, from both Father and Mother. After their testimony, the GAL asserted that Father should be denied visitation because, among other reasons, Father was not Child's biological father. In connection with that argument, the GAL pressed the challenge to the VDP that she had raised in her opposition brief and asked for the VDP to "be declared void and be rescinded," specifically asking for that relief to be "entered pursuant to [section] 78B-15-623" of the Utah Code (referred to herein as "Section 623"), a statutory provision the GAL had not mentioned in her opposition brief. Section 623 provides, in relevant part, that "[a] child is not bound by a determination of parentage" unless "the determination was based on an unrescinded declaration of paternity and the declaration is consistent with the results of genetic testing." *See* Utah Code Ann. § 78B-15-623 (LexisNexis 2018). The GAL asserted that the VDP was subject to a challenge by Child because the results of the genetic testing indicated that Father was not Child's biological father. In addition, the GAL pressed the arguments that had been raised in her brief, asserting that the VDP was fraudulent because Father had allegedly been less than candid when he stated that he "believe[d]" that he was Child's father and when he answered "no" to the question on the form about genetic testing.

¶13   At the conclusion of the hearing, and after a brief recess, the court in an oral ruling granted the GAL's request to invalidate the VDP, relying on Section 623 and on the fact that the genetic testing had conclusively determined that there was no biological relationship between Father and Child. Addressing Father, the court stated, "[Y]ou are not the father of [Child] at this point." And the court declined Father's invitation to order that he receive visitation with Child but, given Father's established biological

relationship with the other two children and given the fact that Father was "probably the only parental figure on the male side that [Child] has know[n]," the court nevertheless left the door open for DCFS to "allow" Father to have visitation with Child if DCFS believed that visitation would serve Child's best interest. The court later signed a minute entry reflecting its oral ruling, therein declaring that the VDP "is void."

ISSUES AND STANDARDS OF REVIEW

¶14 Father appeals the juvenile court's decision to invalidate the VDP and to declare it void. At the center of Father's challenge is his assertion that Child, by and through the GAL, does not possess statutory standing to challenge the VDP. This question is one of statutory interpretation, and on such matters we afford no deference to trial courts' decisions. *See State v. Outzen*, 2017 UT 30, ¶ 5, 408 P.3d 334 ("We review questions of statutory interpretation for correctness, affording no deference to the [trial] court's legal conclusions." (quotation simplified)).

¶15 But before reaching the merits of Father's appeal, we must first determine whether we have jurisdiction to adjudicate it.[2] "Questions about appellate jurisdiction are questions of law" that,

---

2. After recognizing this jurisdictional question, we issued a Sua Sponte Motion for Summary Disposition, explaining that this appeal was being considered for summary disposition "on the basis that this court lacks jurisdiction because the order appealed from was not a final, appealable order." We then ordered the parties to submit briefing on the jurisdictional question, which they did. Later, we also provided the parties the opportunity to submit supplemental briefing on the statutory standing question. Father and the GAL submitted supplemental briefs, and an amicus curiae submitted a brief on this topic as well. We appreciate the assistance of the parties and the amicus curiae in submitting supplemental briefing.

by definition, arise for the first time in the appellate setting. *See Zion Village Resort LLC v. Pro Curb U.S.A. LLC*, 2020 UT App 167, ¶ 21, 480 P.3d 1055 (quotation simplified); *see also Powell v. Cannon*, 2008 UT 19, ¶ 9, 179 P.3d 799 ("The question of whether an order is final and appealable is a question of law." (quotation simplified)).

ANALYSIS

I. Jurisdiction

¶16    Before we may reach the merits of Father's appeal, we must first assess whether we have jurisdiction to adjudicate it. For the reasons discussed, we conclude that we do.

¶17    "As a general rule, an appellate court does not have jurisdiction to consider an appeal unless the appeal is taken from a final order or judgment that ends the controversy between the litigants." *Copper Hills Custom Homes LLC v. Countrywide Bank, FSB*, 2018 UT 56, ¶ 10, 428 P.3d 1133 (quotation simplified); *see also Williams v. State*, 716 P.2d 806, 807 (Utah 1986) (noting that one of the "traditional principles of appellate review" is "the final judgment rule," which generally (subject to a few exceptions) prevents appellate courts from reviewing an appeal unless it comes "from a final judgment concluding all of the issues in the case"). The final judgment rule promotes efficiency by preventing the piecemeal litigation and seriatim appeals that would result if litigants were permitted, by right, to immediately appeal any adverse ruling by a trial court.

¶18    Conceptually, "the finality of an order in juvenile proceedings is determined the same way as the finality of an order in other courts." *In re A.F.*, 2007 UT 69, ¶ 3, 167 P.3d 1070 (quotation simplified). Indeed, in juvenile courts, as in other courts, a "final order is one that ends the current . . . proceedings, leaving no question open for further judicial action." *Id.*

(quotation simplified). Certainly, an order in a juvenile court case that completely resolved all matters as to all parties would be a final order, just as a similar order would be in a district court case.

¶19     But it is fair to say that, in appeals from juvenile court, finality is viewed somewhat more flexibly than in the district court context. "In the child welfare arena, the determining factor in deciding if an order is final and appealable is whether it effects a change in the permanent status of the child." *Id.* Because a child's status can change more than once, and because a "juvenile court frequently retains jurisdiction over cases [even] after some of the issues have been finally resolved," *see In re K.F.*, 2009 UT 4, ¶ 36, 201 P.3d 985 (quotation simplified), "in child welfare proceedings, unlike traditional civil cases, appeals may be heard from more than one final judgment," *In re A.F.*, 2006 UT App 200, ¶ 8, 138 P.3d 65, *aff'd*, 2007 UT 69, 167 P.3d 1070 (quotation simplified). Therefore, a determination of whether a juvenile court order is final and appealable "requires pragmatic analysis of the order itself." *Id.* ¶ 9.

¶20     Under this "pragmatic analysis," "it is the substance, not the form, of the . . . order that matters . . . because the determination whether an order is final and appealable turns on the substance and effect of the order." *Id.* (quotation simplified). Any order that effects a "permanent change in the child's status vis-à-vis the child's parent" is considered final. *See In re K.F.*, 2009 UT 4, ¶ 36. Particular types of orders that are considered final include those "entered upon disposition of an adjudicated petition of abuse, neglect, or dependency" and those "terminating parental rights," *see id.* (quotation simplified), as well as "orders that otherwise relieve a party from further litigation," *see In re A.F.*, 2006 UT App 200, ¶ 10. On the other hand, shelter orders and orders that "merely terminate reunification services and change the child's permanency goal to adoption" are not considered final because they contemplate "further judicial action" regarding the parent and the child. *See In re K.F.*, 2009 UT 4, ¶ 37.

¶21 Father asserts that the juvenile court's order declaring the VDP void is final and appealable because it "effectively terminated the parental rights statutorily conferred upon him" through the VDP. We agree with Father, as does the State. From a finality perspective, the court's order declaring the VDP void is analogous to an order terminating parental rights, because the order canceled theretofore-valid parental rights that Father had (at least temporarily) acquired by virtue of filing a voluntary declaration of paternity that was accepted by the Office of Vital Records and Statistics. *See Scott v. Benson*, 2021 UT App 110, ¶ 22 n.4, 501 P.3d 1148 ("A [voluntary declaration of paternity] is valid and effective if it meets all the basic statutory requirements and is accepted by the Office of Vital Records."), *cert. granted,* 509 P.3d 196 (2022). In analogous contexts, we have determined that similar orders are final and appealable. *See In re A.S.*, 2007 UT App 72U, para. 1 (per curiam) (holding that an order dismissing a putative father "from the termination case and denying a motion for genetic testing" was final and appealable because it "dismissed [the putative father] as a party and relieved him from further litigation"); *see also In re A.F.*, 2006 UT App 200, ¶ 10 (stating that "orders that otherwise relieve a party from further litigation" are appealable).

¶22 The fact that litigation regarding Child continues in the juvenile court is not dispositive of the question of appealability of the subject order. *See In re E.L.F.*, 2011 UT App 244, ¶ 5, 262 P.3d 1196 (recognizing that a "juvenile court's retention of jurisdiction over a child does not necessarily defeat finality"); *see also In re K.F.*, 2009 UT 4, ¶ 36 (stating that a "juvenile court frequently retains jurisdiction over cases [even] after some of the issues have been finally resolved" (quotation simplified)). The fact that the juvenile court left the visitation door slightly ajar for Father likewise does not defeat finality, under the unique circumstances presented here; the court's order deprived Father of all parental rights, leaving DCFS with sole discretion to determine whether, and to what extent, Father may visit Child.

¶23 Applying a pragmatic analysis here, we conclude that the subject order, by eliminating all of Father's claimed parental rights, effected a "permanent change in the child's status vis-à-vis" Father, *see In re K.F.*, 2009 UT 4, ¶ 36, and effectively ended Father's involvement in the case. Under these circumstances, the order from which Father appeals must be considered final, and we therefore have jurisdiction to consider the merits of his appellate challenge.

## II. The Merits of Father's Appeal

¶24 We begin our analysis of the merits of Father's appeal with a discussion of voluntary declarations of paternity, and by explaining how Father did—at least for a time—secure valid parental rights regarding Child. We then list some of the ways in which voluntary declarations of paternity can be challenged, and conclude that Child (through the GAL) had standing to raise one such challenge, and that Child's challenge has merit. Accordingly, we conclude that the juvenile court correctly sustained Child's challenge to the VDP, but should not have referred to it as "void."

### A

¶25 There are a number of ways for a parent to establish a legally valid parent-child relationship, many of which are "based on the notion that parents should generally have parental rights regarding their biological children." *See Scott v. Benson*, 2021 UT App 110, ¶ 18, 501 P.3d 1148, *cert. granted*, 509 P.3d 196 (2022); *see also Lehr v. Robertson*, 463 U.S. 248, 256–57 (1983) (recognizing "[t]he intangible fibers that connect parent and child"); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (holding that a biological father's interest "in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest," constitutional protection). "In most cases, parental status is established, based on an assumed biological connection, simply by presumption of circumstance." *Scott*, 2021 UT App 110, ¶ 19. For example, in the absence of a valid gestational agreement,

a mother establishes a parental relationship with any child to whom she gives birth. *See* Utah Code Ann. § 78B-15-201(1)(a)(i) (LexisNexis 2018).

¶26    Some fathers also obtain parental rights by presumption of circumstance. For instance, a father-child relationship is established when a man "and the mother of the child are married to each other" when the child is born. *Id.* §§ 78B-15-201(2)(a), -204(1)(a). But a father who is not married to the mother of the child must take additional steps to establish his paternity.

¶27    One avenue open to unmarried biological fathers is to establish paternity by declaration, an option that—crucially— requires the written consent of the child's mother. *See id.* §§ 78B-15-301, -302. A successful declaration of paternity, "duly signed and filed, has the same effect as a judicial determination of paternity." *In re S.H.*, 2005 UT App 324, ¶ 15, 119 P.3d 309. To be effective, both the mother and declarant father must sign the declaration "in the presence of two witnesses" and make several statements "under penalty of perjury." *See* Utah Code Ann. § 78B-15-302(1). Of particular relevance here, the parties must also attest that the child "whose paternity is being declared" does not have a presumed, adjudicated, or declarant father, and they must "state whether there has been genetic testing and, if so, that the declarant man's paternity is consistent with the results of the testing." *See id.* § 78B-15-302(1)(d), (e). "A declaration of paternity shall be considered effective when filed and entered into a database established and maintained by the Office of Vital Records." *Id.* § 78B-15-302(9).

¶28    Father chose this avenue; he and Mother jointly signed and filed the VDP on August 18, 2021, after answering several written questions under penalty of perjury. As already noted, they both averred that they "believe[d]" Father to be Child's biological father, and Father answered "no" to a question asking whether "the birth mother, child, and biological father [had] submitted to genetic testing." The Office of Vital Records and Statistics

accepted the VDP as valid, and that same day issued an amended birth certificate for Child, listing Father as Child's father. At that point, Father's parental rights regarding Child were definitively established. *See id.* § 78B-15-305(1) (LexisNexis 2018) (stating that "a valid declaration of paternity filed with the Office of Vital Records is equivalent to a legal finding of paternity of a child and confers upon the declarant father all of the rights and duties of a parent"); *see also Scott*, 2021 UT App 110, ¶ 22 n.4 ("A declaration is valid and effective if it meets all the basic statutory requirements and is accepted by the Office of Vital Records."); *In re S.H.*, 2005 UT App 324, ¶ 15 (stating that a declaration of paternity "duly signed and filed, has the same effect as a judicial determination of paternity").

B

¶29 Declarations can, however, be challenged after they have been accepted by the Office of Vital Records and Statistics. *See Scott*, 2021 UT App 110, ¶ 23 ("Voluntary declarations of paternity are, however, subject to challenge."). Applicable statutes permit several different types of challenges to validly filed declarations. For example, a declaration may be challenged as "void" if it fails to meet certain threshold criteria regarding the existence of another potential father. *See* Utah Code Ann. § 78B-15-302(3) (referred to herein as "Section 302"). Alternatively, a "signatory" of a declaration may rescind it within sixty days, without specifying any reason. *Id.* § 78B-15-306(1) (referred to herein as "Section 306"). Further, after the rescission period has expired, a declaration may be challenged by certain parties "on the basis of fraud, duress, or material mistake of fact." *See id.* § 78B-15-307 (referred to herein as "Section 307"). And as relevant here, Section 623 provides that "[a] child is not bound by a determination of parentage . . . unless . . . the determination was based on an unrescinded declaration of paternity and the declaration is consistent with genetic testing." *See id.* § 78B-15-623(2).

¶30 Before the juvenile court, the GAL raised a challenge to the VDP and, by the time of the hearing, had elected to ground that challenge largely in Section 623.[3] The court accepted the GAL's Section 623 argument, and Father challenges that decision here on appeal. For the reasons that follow, we conclude that the juvenile court correctly found merit in the GAL's Section 623 challenge.

¶31 Section 623 begins by stating that "a determination of parentage is binding on . . . all signatories to a declaration . . . of paternity . . . and . . . all parties to an adjudication [of parentage] by a tribunal." *Id.* § 78B-15-623(1). The next section of the statute provides as follows:

---

3. As noted already, the GAL's pre-hearing briefing before the juvenile court invoked Sections 302 and 307, but not Section 623. In their briefing on appeal, the parties include some discussion of other potential avenues for challenge. No party invokes Section 306, and both the State and the GAL appear to concede that the GAL—apparently because Child is not a "signatory" to the VDP—does not have statutory standing to challenge the VDP under Section 307. But the State does appear to invoke Section 302 in connection with its argument that the VDP was "fraudulently executed," and on that basis appears to ask us to affirm the juvenile court's ruling on this alternative ground. We have serious doubts about the merits of this argument, primarily because none of the three criteria for voidness set forth in Section 302 are present here, but also because any evidence of fraud on the part of Father or Mother is thin at best: they were not sure whether Father was Child's biological parent, but had a basis to "believe" that he was, and Father's answer about the state of genetic testing was technically correct, because on August 18 neither Mother nor Child had yet submitted samples for genetic testing. But we need not delve deeper into the State's alternative argument, because we affirm the substance of the court's ruling under Section 623.

(2) A child is not bound by a determination of parentage under this chapter unless:

(a) the determination was based on an unrescinded declaration of paternity and the declaration is consistent with the results of genetic testing;

(b) the adjudication of parentage was based on a finding consistent with the results of genetic testing and the consistency is declared in the determination or is otherwise shown; or

(c) the child was a party or was represented in the proceeding determining parentage by a guardian ad litem.

*Id.* § 78B-15-623(2). The precise question presented is whether Section 623 gives a child the right to challenge a putative father's duly filed declaration of paternity on the basis that the declaration is inconsistent with genetic testing results. We hold that it does.

¶32    The question before us is, at root, one of statutory interpretation. "When interpreting a statute, our primary objective is to ascertain the intent of the legislature, the best evidence of which is the plain language of the statute itself." *Taylor v. Taylor*, 2022 UT 35, ¶ 28, 517 P.3d 380 (quotation simplified). In examining the language of a statute, "we do not view individual words and subsections in isolation; instead, our statutory interpretation requires that each part or section be construed in connection with every other part or section so as to produce a harmonious whole." *Penunuri v. Sundance Partners Ltd.*, 2013 UT 22, ¶ 15, 301 P.3d 984 (quotation simplified); *see also State v. Bess*, 2019 UT 70, ¶ 25, 473 P.3d 157 ("We read the plain language of the statute as a whole and interpret its provisions in harmony with other statutes in the same chapter and related chapters." (quotation simplified)). And if this exercise "provides

a workable result, we need not resort to other interpretive tools, and our analysis ends." *Torrie v. Weber County*, 2013 UT 48, ¶ 11, 309 P.3d 216 (quotation simplified). In accordance with these principles, we begin our analysis with an overview of the relevant statute's structure.

¶33    The statute in question is the Utah Uniform Parentage Act (the Act), codified at Title 78B, Chapter 15 of the Utah Code. *See* Utah Code Ann. §§ 78B-15-101 to -902 (LexisNexis 2018). Section 623's reference to "a determination of parentage under *this chapter*," then, refers to any determination of parentage made under any of the various parts of the Act. *See id.* § 78B-15-623(2) (emphasis added). Part 3 of the Act governs voluntary declarations of paternity, *see id.* §§ 78B-15-301 to -313, and Part 6 of the Act governs judicial adjudications of parentage, *see id.* §§ 78B-15-601 to -623. Indeed, the term "determination of parentage," as used in Section 623, has a specific statutory definition: our legislature has provided that a "determination of parentage" means either (a) "the establishment of the parent-child relationship by the signing of a valid declaration of paternity under Part 3," or (b) "adjudication [of parentage] by a tribunal" under Part 6. *See id.* § 78B-15-102(9).

¶34    In this case, any parental rights claimed by Father are derived not from any judicial adjudication of paternity but, rather, from the VDP. Indeed, the Act is clear with regard to the effect of a properly filed declaration of paternity: "a valid declaration of paternity filed with the Office of Vital Records is equivalent to a legal finding of paternity of a child and confers upon the declarant father all of the rights and duties of a parent," without the necessity of initiating judicial proceedings or obtaining a court order. *See id.* § 78B-15-305(1); *see also In re S.H.*, 2005 UT App 324, ¶ 15 (stating that a declaration of paternity "duly signed and filed, has the same effect as a judicial determination of paternity"). Phrased in the language of Section 623, then, the "determination of parentage" at issue here took place pursuant to Part 3, not Part 6, and it occurred not in any courtroom but at the front counter

(or its metaphorical online equivalent) at the Office of Vital Records and Statistics.

¶35    As noted, Section 623 provides that "[a] child is not bound by a determination of parentage" unless at least one of three criteria are met. *See* Utah Code Ann. § 78B-15-623(2). With regard to the specific "determination of parentage" at issue here, none of the three listed criteria are met.

¶36    First, the "determination of parentage" at issue in this case was not "based on an unrescinded declaration of paternity" that is "consistent with genetic testing." *See id.* § 78B-15-623(2)(a). To be sure, the determination of parentage here was based on an "unrescinded declaration of paternity"; after all, Father's only claim to paternity was made through the VDP, and neither Father nor Mother had exercised any rights they had, pursuant to Section 306, to rescind the VDP within sixty days of signing it. *See id.* § 78B-15-306. But the unrescinded VDP at the heart of Father's paternity claim turned out to be entirely inconsistent with the genetic test results that came back in September 2021. For this reason, the "determination of parentage" at issue here was not based on a declaration of paternity that was "*consistent with* the results of genetic testing." *Id.* § 78B-15-623(2)(a) (emphasis added). Thus, the first criterion is inapplicable.

¶37    The second criterion is likewise inapplicable, for two reasons. First, this criterion applies only to an "adjudication of parentage," *see id.* § 78B-15-623(2)(b), and no such adjudication occurred here, where Father's parental rights, if any, are derived under Part 3, from the VDP, rather than through a judicial process. And second, this criterion also depends upon "genetic testing" being "consistent with" the adjudication of parentage and, as already noted, the genetic testing in this case excluded Father from any biological relationship with Child. *See id.*

¶38    Finally, the third criterion has no application either. That criterion applies if "the child was a party or was represented in

the proceeding determining parentage by a guardian ad litem." *Id*. § 78B-15-623(2)(c). To be sure, Child was represented by the GAL in the proceedings before the juvenile court, and is represented by the GAL in this appeal. But Child was not involved, in any way, in the "proceeding determining parentage" at issue here. Again, that "proceeding" occurred on August 18, 2021, when Father and Mother appeared at the Office of Vital Records and Statistics to fill out the VDP, and when that office accepted the VDP they filed. That proceeding took place entirely outside of court, and Child had no voice or representation therein. Accordingly, the third criterion is likewise inapplicable.

¶39   Because none of the three exceptional criteria apply here, Section 623 provides that Child is "*not bound by* [the] determination of parentage" in this case. *See id*. § 78B-15-623(2) (emphasis added). In our view, this language must necessarily mean that Child has the right to challenge the VDP.[4]

¶40   The words "not bound by" are not defined in the Act. In such a situation, we "interpret the statutory language according to the plain meaning of its text." *See O'Hearon v. Hansen*, 2017 UT App 214, ¶ 24, 409 P.3d 85 (quotation simplified). And in doing so, we give the words the meaning they are given in ordinary daily usage. *See State v. Rincon*, 2012 UT App 372, ¶ 10, 293 P.3d 1142 ("When construing a statute, words that are used in common, daily, nontechnical speech, should, in the absence of evidence of a contrary intent, be given the meaning which they have for laymen in such daily usage." (quotation simplified)).

¶41   In our view, the words "not bound by" must include a right to challenge the determination of parentage. A child who has no

---

4. After all, Part 6 of the Act expressly provides that "the child" may maintain "a proceeding to adjudicate parentage," and thereby challenge a parent's paternity. *See* Utah Code Ann. § 78B-15-602(1). All parties to this appeal agree that a child has statutory standing under Part 6 to challenge a parent's paternity.

right to challenge the determination in question, even in a case where none of the three statutory criteria applied, would effectively be bound by it. Stated another way, in order to be "not bound by" something, there must exist a way to get out from under its obligations. After all, the words "not bound by" would be deprived of all effective meaning if a child had no right to challenge the determination of parentage at issue. Even Father and the amicus curiae both acknowledge, in recently filed briefs, that Child has statutory standing to challenge the VDP under Part 6. For these reasons, we conclude that Section 623 provides Child the right to challenge the VDP—an unrescinded declaration of paternity upon which Father's claim to paternity is based—on the ground that the declaration is inconsistent with "the results of genetic testing." *See* Utah Code Ann. § 78B-15-623(2)(a).

¶42 Once it is established that Child has the right to mount a challenge to the VDP, we must turn to the merits of that challenge. And Father, here on appeal, does not seriously contest the merits of Child's attack on the VDP. Father instead acknowledges, as he must, that the genetic testing excluded him as Child's biological father, and that the genetic testing is, therefore, inconsistent with his claims to paternity under the VDP. Accordingly, the juvenile court correctly determined that Child's Section 623 challenge to the VDP was meritorious.

¶43 But while the juvenile court's ruling is correct on its merits, the court used incorrect nomenclature to describe the effect of its ruling. The court ruled that the VDP "is void," thereby apparently purporting to invalidate it *ab initio* and render it without force or effect from the date it was filed. This was incorrect. A challenge to a declaration of paternity based on inconsistency with genetic testing is a challenge alleging "a material mistake of fact." *See id.* § 78B-15-307(5) (stating that "genetic test results that exclude a declarant father . . . constitute a material mistake of fact"). And as we explained in *Scott*, the effect of a successful challenge on this basis—as opposed to a challenge grounded in Section 302 or Section 306—is "not that the declaration of paternity is rendered

void from its inception" but, instead, that the "declaration will be set aside, on a going-forward basis." *See* 2021 UT App 110, ¶ 40.

¶44    In our view, a challenge brought by a child under Section 623 alleging that genetic testing is inconsistent with a declarant father's declaration is substantively similar to the type of challenge we examined in *Scott*. Neither challenge is grounded in Sections 302 or 306, statutory provisions that expressly provide that voidness will result from a successful challenge. And both challenges arise from the same set of circumstances, namely, genetic testing that does not match a putative father's claims to paternity. We therefore hold that, where a child makes a successful Section 623 challenge to a declaration of paternity, the result is that the declaration "will be set aside, on a going-forward basis," and will not be declared void from the date of its inception. *See id.* As applied to this case, these principles dictate that Father had legal parental rights for some three months, from August 18 through November 16, 2021, but that his parental rights ended, prospectively, with entry of the court's order sustaining Child's Section 623 challenge.

¶45    Finally, both Father and the amicus curiae—in recently filed supplemental briefs—raise the potential applicability of section 78B-15-608 of the Utah Code (referred to herein as "Section 608"), a statutory section that allows a court, under certain conditions, to "disregard genetic test results that exclude the . . . declarant father." Father asserts, for the first time in his supplemental brief, that he should be entitled to a hearing to determine whether the genetic test results eliminating him as Child's biological father should be "disregarded" pursuant to Section 608. But Father makes this request for the first time in this recent brief; he did not raise a Section 608 defense to the GAL's challenge before the juvenile court, nor did he mention Section 608 in either his opening or reply brief on appeal. Under these circumstances, Father has raised this legal theory far too late for us to consider it in the context of this appeal. *Cf. Viertel v. Body Firm Aerobics LLC*, 2022 UT App 96, ¶ 11, 516 P.3d 791

("Appellants are not permitted to raise matters for the first time in a reply brief." (quotation simplified)).

¶46 The amicus curiae, for its part, asserts that it was "mandatory" for the juvenile court to have conducted a Section 608 inquiry, including a "best interest of the child" analysis, even in the absence of a request by Father for it to do so; in this vein, the amicus curiae argues that the juvenile court committed plain error by not engaging in that analysis sua sponte. In particular, the amicus curiae rests its argument on statutory language stating that the court "*shall* consider the best interest of the child." *See* Utah Code Ann. § 78B-15-608(2) (emphasis added). But in our view, the amicus curiae overreads the statute.

¶47 As we interpret it, Section 608 does not compel a juvenile court, in every instance in which any challenge to a VDP is sustained, to undertake a Section 608 analysis even if none of the parties request it. Litigants are entitled to select the specific defenses they raise to an opponent's claim. The general rule, applicable in both district and juvenile courts, is that parties must request specific relief in order for a court to award it. Our judicial process ordinarily does not require courts to step in and examine legal theories that the parties have not themselves raised. *See State v. Johnson*, 2017 UT 76, ¶ 14, 416 P.3d 443 ("Under our adversarial system, the parties have the duty to identify legal issues and bring arguments before an impartial tribunal to adjudicate their respective rights and obligations."). In this case, Father—who was represented by counsel at the time—elected to defend against the GAL's challenge to the VDP by calling into question the GAL's (or Child's) right to even mount the challenge. Father did not raise Section 608 as a possible defense, and he did not ask the juvenile court—in the event it concluded that the GAL had standing to challenge the VDP—to disregard the results of the genetic testing pursuant to Section 608.

¶48 We take the amicus curiae's point that, whenever a party *does* specifically invoke Section 608 and ask a court to disregard

genetic test results, that court must "consider the best interest of the child" in determining whether to do so. *See* Utah Code Ann. § 78B-15-608(2). But courts do not have an obligation to sua sponte raise Section 608, and undertake its concomitant best-interest analysis, in every case in which they are asked to consider a challenge to a VDP.[5] *See Utah Stream Access Coal. v. VR Acquisitions, LLC*, 2019 UT 7, ¶ 41, 439 P.3d 593 (stating that "judges are neutral arbiters—not advocates," and that judges "keep [themselves] out of the business of second-guessing the pleading decisions of the parties"); *cf. Scott*, 2021 UT App 110, ¶ 43 (noting that the lower court, in that case, turned to a Section 608 analysis only at the "request" of one of the parties). If a putative parent wants a court to take the rather drastic and

---

5. The amicus curiae runs into the same problem with its other best-interest related argument. It points out that guardians ad litem have authority created by statute, and that they are appointed "to represent the best interest of a minor." *See* Utah Code Ann. § 78A-2-803(1)(a)(i) (LexisNexis Supp. 2022). It asserts that the GAL in this case, by challenging Father's paternity, acted outside Child's best interest, pointing out that Child has no other father figure in his life, and offering its view that "it is difficult to see how it can be in a child's best interest to challenge the paternity of the only father figure participating in the case." We acknowledge this argument, and agree with the amicus curiae that guardians ad litem have a statutory obligation to carefully consider whether the actions they take on a child's behalf are in the child's best interest. But ordinarily any challenge to a guardian ad litem's actions as being outside a child's best interest must come from one of the parties rather than from a court sua sponte, and must be raised in the first instance in the district or juvenile court. No such challenge was levied here by any party before the juvenile court, rendering the merits of any such challenge inappropriate for appellate review.

unusual step of disregarding the results of genetic testing, it will ordinarily be the parent's responsibility to raise the issue.

¶49    And even assuming, for the purposes of the discussion, that plain error review is available here, *see Kelly v. Timber Lakes Prop. Owners Ass'n*, 2022 UT App 23, ¶ 42 n.10, 507 P.3d 357 (suggesting that plain error review may be available in certain types of civil cases, including termination of parental rights cases), we reject the amicus curiae's assertion that, on the record before us, the juvenile court committed plain error by not invoking Section 608 sua sponte. Plain error occurs only when a court commits an obvious prejudicial error. *See Johnson*, 2017 UT 76, ¶ 20. Here, the juvenile court committed no obvious error. Nothing in Section 608 indicates that it is to be applied in every case, even sua sponte, regardless of whether any party ever invokes it. And the amicus curiae cites no appellate court case that so indicates. Where the law is not clear, a court does not commit obvious error. *See State v. Dean*, 2004 UT 63, ¶ 16, 95 P.3d 276 ("To establish that the error should have been obvious to the trial court, [a litigant] must show that the law governing the error was clear at the time the alleged error was made.").

¶50    For these reasons, the juvenile court did not plainly err by not sua sponte undertaking an analysis pursuant to Section 608. And because Father did not raise that issue either before the juvenile court or in his initial brief, we decline to address Father's argument that the court should have conducted such an analysis. We offer no opinion, however, regarding whether the issue could properly be raised after remand, especially given the fact that the juvenile court left the door open to Father's involvement in the case going forward.

CONCLUSION

¶51    We have jurisdiction to consider the merits of Father's appeal, because the juvenile court's order canceled the parental

rights that Father had temporarily acquired by filing the VDP and thereby effected a permanent change in Child's status regarding Father. But on the merits of that appeal, we conclude that the juvenile court correctly sustained the GAL's Section 623 challenge to the VDP, even if the court should not have used the word "void" to describe the result of its ruling. We therefore affirm the juvenile court's decision to sustain the GAL's challenge to the VDP, but remand with instructions for the court to modify its order to indicate that it has prospective effect only, and for such other proceedings as may be appropriate.

—————