**2024 UT App 147**

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF J.M., S.M., L.M., AND J.A.M.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

N.M.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20230310-CA
Filed October 18, 2024

Eighth District Juvenile Court, Vernal Department
The Honorable Ryan B. Evershed
No. 1116736

Jason B. Richards, Alexandra Mareschal, and
Kirstin Norman, Attorneys for Appellant

Sean D. Reyes, Sandi F. Clemens, and John M.
Peterson, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN D. TENNEY concurred.

ORME, Judge:

¶1     N.M. (Mother) appeals the juvenile court's termination of her parental rights, arguing her counsel (Counsel) provided ineffective assistance by using an improper procedure to withdraw her response to the custody petition. She also challenges the court's "strictly necessary" determination. Because Mother's ineffective assistance claim is untimely, we do not reach

its merits. And we otherwise uphold the juvenile court's termination of her parental rights.

BACKGROUND

¶2    In September 2021, police found J.M., S.M., and L.M.[1] walking along a busy highway with their father (Father). Father was arrested after he fled the scene, leaving the three children behind. The children were inadequately dressed for their walk—at least one did not have shoes and another was not wearing a shirt. Their hygiene had also been ignored. They were placed in emergency custody with the Division of Child and Family Services (DCFS).

¶3    A fourth child, J.A.M., was at home with Mother. Inside the family apartment, DCFS investigators found "lots of trash" and "old food" on the kitchen floors and counters. Smoke alarms had been removed, and Mother told investigators the hot water heater had been broken for about three weeks. The front door was broken because, according to Mother, a neighbor had kicked it in. Investigators did not observe any usable beds or bedding in what would have been the children's bedrooms. Mother told them the children slept in the primary bedroom with her and Father. Mother attributed the disarray to the family trying to move. Given the state of the home, DCFS decided to remove all four children (the Children).

¶4    This was not the family's first encounter with DCFS. As the juvenile court later recognized, the three oldest children—J.M., S.M., and L.M.—had been removed from Mother's and Father's custody multiple times and, as the juvenile court later stated, they had "been under DCFS and court supervision for most of their

---

1. "The identity of minors should be protected by use of descriptive terms, initials, or pseudonyms." *See* Utah R. App. P. 24(d).

lives." In June 2015, a protective supervision services (PSS) case was opened against Mother due to fetal exposure of J.M. to illegal substances. In that case, the juvenile court found that Mother and Father had been using drugs, had no stable housing, and had incidents of domestic violence. In March 2016, the court made additional findings regarding environmental neglect and child endangerment due to the parents' illegal drug use, resulting in J.M. and later S.M., after his birth, being removed from the home. Custody was eventually returned to Mother subject to protective supervision, and the case was closed in June 2017. But in August 2017, DCFS again determined Mother had exposed her unborn child, this time L.M., to illegal substances, so a third PSS case was opened and remained open until August 2018. In August 2019, a fourth PSS case was opened due to the parents' physical neglect, domestic-violence-related child abuse, and child endangerment. The three oldest children were again removed, but after extensive in-home services, they were returned to Mother, and the case was closed in January 2021.

¶5     The day after the Children were removed in the case now before us, in September 2021, the State filed a petition asking the juvenile court to find the Children "abused, neglected, and/or dependent" and to award custody to DCFS or to an appropriate family member. At the shelter hearing, the court ordered the Children to remain in DCFS custody, appointed a guardian ad litem to represent the Children, and appointed Counsel to represent Mother.

¶6     In December 2021, Mother and Father attended mediation in which they agreed to respond to the allegations of the custody petition under rule 34(e) of the Utah Rules of Juvenile Procedure "by declining to admit or deny the allegations," meaning the allegations would "be deemed true," provided the State amended

those allegations.[2] Thereafter, the State filed an amended custody petition. At a hearing the next day, the court conducted a colloquy with both Mother and Father, inquiring into whether they understood "that a Rule 34(e) plea is like a no contest plea" under which they would be giving up certain rights. The court endeavored to ensure that they did not feel pressured to respond in this way and that they were not under the influence of drugs or alcohol. The court then accepted the allegations of the petition as true, adjudicated the Children abused and neglected, and canceled the scheduled adjudication trial.

¶7     On January 4, 2022, the court issued its written adjudication order (the Adjudication Order) in which it found that Mother and Father "understood the proceedings and the effect of their" no-contest responses and that they chose this procedural option "willingly and knowingly." The court found that the "allegations and facts contained in the State's Petition are true and correct" and, based on this, concluded the Children were

---

2. Throughout their briefing, the parties have referred to Mother's response as a rule 34(e) "answer" or "plea." But these are misnomers. Rule 34(e) offers two distinct avenues for responding to a petition in a child welfare case—either the respondent "may answer by admitting or denying the specific allegations of the petition," or the respondent may "declin[e] to admit or deny the allegations." Utah R. Juv. P. 34(e). Mother took the latter tack. She did not answer the petition, instead choosing to neither admit nor deny the allegations in the State's custody petition. This was not an answer contemplated by the first part of rule 34(e) nor was it a criminal plea. To avoid perpetuating this misuse of terminology and to better capture the unique nature of the latter part of the rule, we refer to Mother's rule 34(e) response as a "no-contest response," per our recent decision, *In re B.D.*, 2024 UT App 104, ¶ 12.

abused and neglected. Accordingly, the court awarded guardianship of the Children to DCFS.

¶8 That same day, the court held a disposition hearing in which DCFS recommended against further reunification services for the family. Upon learning of this recommendation, Mother filed a "Motion to Withdraw Rule 34(e) No Contest Plea" in which she requested leave to withdraw her no-contest response, asserting it was "not made knowingly or voluntarily."[3] She argued, among other things, that she had expected DCFS to make reasonable reunification efforts, as it had done multiple times in the past, and she argued she "would have never pled no contest to the Petition if she knew DCFS were recommending termination of reunification, relatively immediately after adjudication." And she further contended that under rule 25A(b)(1) of the Utah Rules of Juvenile Procedure, "pleas of no contest may be withdrawn with leave of the Court upon showing the plea was not knowingly or voluntarily made."

¶9 On February 2, 2022, oral argument was held on Mother's motion. The court denied what it called Mother's motion "to set aside" her no-contest response because it found the response had been "made knowingly and voluntarily." The court found that Mother had been advised by Counsel, had attended mediation, had had "[a] lot of time to think," had successfully requested that the petition be amended, and had been informed of her rights by the court. Further, the court found that Mother would likely have responded to the amended petition as she did even if she knew that reunification services would not be offered, because trial on the merits of the amended petition could have hurt her case if the State brought up additional information and everything was "out in the open."

---

3. Father filed a similar motion, but because he does not join in this appeal, we do not detail it here.

¶10 In the meantime, DCFS began investigating potential kinship placements for the Children with reference to a list submitted by Mother, starting with the Children's paternal aunt. Because the aunt lived in South Carolina, DCFS initiated a request under the Interstate Compact on the Placement of Children (ICPC), but the request was denied after the aunt failed to respond and provide necessary information. DCFS then initiated an ICPC request for the Children's paternal grandmother (Grandmother), who also lived in South Carolina. But due to several administrative errors, the request was delayed for seven months. DCFS also initiated an ICPC request for a paternal uncle in Oregon, who could not take any of the Children, and for another paternal uncle in Virginia, who was eventually approved to take two of the Children. The two oldest children, J.M. and S.M., were subsequently placed with this uncle in Virginia. Because another suitable kinship placement could not be found for L.M. and J.A.M., they remained in foster care.

¶11 In April 2022, the State filed a petition for termination of Mother's and Father's parental rights. At the four-day termination trial, various witnesses testified about the events outlined above. In particular, Grandmother testified about her desire to be a kinship placement for the Children. She stated she had not been contacted in South Carolina as a result of the ICPC request. She testified that while she had not asked for visitation with the Children since their removal, she had contacted DCFS about becoming a placement. She expressed frustration with DCFS, believing it was "keeping a lot of secrets" and being "dishonest." She admitted she did not trust DCFS and that, barring a court order to the contrary, she felt it was safe to return the Children to their parents. She also admitted she had arranged to pick up a fifth child born to the parents in Colorado during the pendency of this

case and take the infant to South Carolina until "this case closed."[4] Several other witnesses testified, including the Children's then-current placements as well as Mother and Father.

¶12 The court later issued its termination order (the Termination Order), in which it found that Mother and Father had neglected the Children. The court went on to find that termination was in the Children's best interest. As part of its best-interest inquiry, the court found it was strictly necessary to terminate Mother's and Father's parental rights. After noting the efforts made to place the Children in a kinship placement with their paternal aunt, two paternal uncles, and Grandmother, the court stated that there was "simply no family placement available in this case that could accommodate all four children." As concerns Grandmother, the court indicated that because her house had only one extra bedroom, she could only possibly be approved as a placement for two of the Children. The court also acknowledged the various administrative errors that had waylaid Grandmother's ICPC approval, but it ultimately found that Grandmother was not an appropriate placement for the Children.[5]

---

4. The evidence suggested that Father had driven Mother hours away to a hospital in Colorado that did not have a maternity ward and that while being transported to another hospital that did, she delivered the new baby in an ambulance. Grandmother was then supposed to travel to Colorado and bring the child back to South Carolina with her, in an apparent effort to avoid DCFS interference.

5. During the trial, the court learned that Grandmother's ICPC request was still pending. The court "strongly considered" staying the trial to await the ICPC decision, but it ultimately decided against doing so because (1) no party requested it and (2) "an approved ICPC would not change the Court's mind as to whether [Grandmother] would be an appropriate placement."

¶13 In its extensive findings regarding Grandmother, the court found she "never requested to have contact or visitation with the [C]hildren" after their removal and she "never contacted DCFS or the Court to ask for updates" about the delayed ICPC request. The court found that "Grandmother believes whatever the parents tell her regarding the conditions of the home, problems with the placements, and case issues" and that she "seemed unaware . . . of the significance of the issues faced by the family and the neglect occurring in the family home." The court also noted Grandmother's testimony that she regretted "initially reporting the parents to DCFS years ago" and that she "wouldn't do that now." Further, the court found that Grandmother's relationship with her son in Virginia—J.M. and S.M.'s placement—had reached the point of no contact because Grandmother "bought into the lies and paranoia" sown by Mother and Father regarding DCFS. The court noted that Grandmother testified at trial that "if the [C]hildren were placed with her, she would return" them to Mother and Father "when she thought it was appropriate." And Grandmother admitted to conspiring to take the fifth child to South Carolina to avoid DCFS involvement. *See supra* note 4. Ultimately, the court concluded it could not "trust [Grandmother] to ensure the safety and protection of the [C]hildren."

¶14 The court also considered alternatives to termination. But it found that the placement of J.M. and S.M. in Virginia "should not be disturbed" as they "are thriving with the family." The court found that while J.M. and S.M.'s kinship placement was "more amenable to a non-termination option," adoption was strictly necessary, as evidenced by the fact that the relationship between the parents and the paternal uncle's family had "deteriorated to a point where they are not having contact." The court found J.M. and S.M. were "integrated into the family," called their aunt and uncle "mom and dad," viewed their cousins as siblings, and considered them "their primary family."

¶15 As for the younger children, L.M. and J.A.M., the court found that though they were not placed with kin, they were also thriving. The court found permanent guardianship with their foster family was not a suitable alternative to termination because "after many years of assistance," Mother and Father "cannot adjust their circumstances to properly care for" them. The court noted that Mother and Father had "a lot of animosity" for the foster parents and had threatened them with legal action, saying they would "get what is coming to them." The court also found that Mother and Father instructed L.M. and J.A.M. to expose the foster parents' "lies."

¶16 Further, the court found that Mother and Father had complained multiple times about the Children calling their placements "mom and dad" and had "put their needs above the children's and consistently allowed this concern to get in the way of having productive visits with" them. Accordingly, the court found that adoption of all the Children was in their best interest and that termination was strictly necessary to facilitate it. The court ordered both Mother's and Father's parental rights terminated.

¶17 Mother appeals.

### ISSUES AND STANDARDS OF REVIEW

¶18 On appeal, Mother argues Counsel provided ineffective assistance by using an improper procedure to seek withdrawal of her no-contest response to the State's custody petition. "In child welfare cases, we employ the *Strickland* test to determine a claim for ineffective assistance of counsel." *In re K.J.*, 2024 UT App 47, ¶ 45, 548 P.3d 886 (quotation simplified), *cert. denied*, 554 P.3d 924 (Utah 2024). But here, we must first determine the threshold issue of whether we have jurisdiction to reach the merits of this argument. "Questions about appellate jurisdiction are questions of law that, by definition, arise for the first time in the appellate

setting." *In re R.P.*, 2024 UT App 106, ¶ 7, 554 P.3d 1183 (quotation simplified).

¶19 Mother also argues it was not strictly necessary to terminate her parental rights. Specifically, she challenges the juvenile court's determination that DCFS made adequate efforts to locate a kinship placement with Grandmother, and she argues the court failed to consider permanent guardianship with Grandmother or the Children's current placements as an alternative to outright termination of her parental rights. "Whether a parent's rights should be terminated presents a mixed question of law and fact" and "we will thus overturn a juvenile court's termination decision only if it is against the clear weight of the evidence or leaves us with a firm and definite conviction that a mistake has been made." *In re B.W.*, 2022 UT App 131, ¶ 45, 521 P.3d 896 (quotation simplified), *cert. denied*, 525 P.3d 1269 (Utah 2023). "Put differently, we will overturn a termination decision only if the juvenile court either failed to consider all of the facts or considered all of the facts and its decision was nonetheless against the clear weight of the evidence." *Id.* (quotation simplified).

## ANALYSIS

### I. Mother's No-Contest Response

¶20 Counsel argued that Mother's no-contest response, pursuant to which the allegations of the amended custody petition were deemed true, should have been withdrawn under rule 25A(b)(1) of the Utah Rules of Juvenile Procedure because it "was not knowingly or voluntarily made." On appeal, Mother argues this was the wrong procedure to withdraw her response

and, thus, Counsel provided ineffective assistance. But we lack jurisdiction to address the merits of this claim.[6]

¶21    "This court has original jurisdiction over appeals from the juvenile court," *In re R.P.*, 2024 UT App 106, ¶ 8, 554 P.3d 1183 (citing Utah Code § 78A-4-103(3)(c)), "and our rules of appellate procedure provide that a party may appeal 'a final order or judgment,'" *id.* (quoting Utah R. App. P. 3(a)(1)). "[I]n appeals from juvenile court, finality is viewed somewhat more flexibly than in the district court context." *In re J.E.*, 2023 UT App 3, ¶ 19, 524 P.3d 1009. "The determining factor in deciding which orders in a child welfare case are final and appealable as a matter of right is whether the order effects a change in the permanent status of the child." *In re R.P.*, 2024 UT App 106, ¶ 11 (quotation simplified).

¶22    "Utah's appellate courts have determined that in child welfare proceedings, unlike traditional civil cases, appeals may be heard from more than one final judgment." *Id.* ¶ 9 (quotation simplified). "This difference does not stem from a different

---

6. We were informed by the parties that no-contest responses under rule 34(e) have been referred to in juvenile court as "no-contest pleas" and utilized in an informal procedure that borrows from criminal law and from rules 24 through 29 of the Utah Rules of Juvenile Procedure, which govern delinquency. We note that because a no-contest response entered under rule 34(e) applies to "non-delinquency cases," *see* Utah R. Juv. P. 34(a), it should be governed by the Utah Rules of Civil Procedure—not criminal law or delinquency procedure, *see id.* R. 2(a) ("When the proceeding involves neglect, abuse, dependency, termination of parental rights, adoption, status offenses or truancy, the Utah Rules of Civil Procedure shall apply unless inconsistent with these rules."). The Advisory Committee on the Utah Rules of Juvenile Procedure may wish to adopt a rule governing the process by which no-contest responses entered pursuant to rule 34(e) may be withdrawn.

application of or exception to the final judgment rule, but rather from the unique nature of juvenile court jurisdiction, which often continues after a final judgment is rendered." *Id.* (quotation simplified). But "where a final ruling or order of the trial court goes unchallenged by appeal, such becomes the law of the case, and is not thereafter subject to later challenge." *In re H.H.*, 2024 UT App 25, ¶ 87, 546 P.3d 39 (quotation simplified), *cert. denied*, 550 P.3d 997 (Utah 2024). "A notice of appeal in a child welfare case must be filed within fifteen days after the entry of the operative court order." *In re R.P.*, 2024 UT App 106, ¶ 8*. See* Utah R. App. P. 52(a); Utah R. Juv. P. 52(a)(1). And "[i]f an appeal is not timely filed, this court lacks jurisdiction over the issues raised." *In re R.P.*, 2024 UT App 106, ¶ 8.

¶23    Here, the Adjudication Order was a final, appealable order. *See In re H.H.*, 2024 UT App 25, ¶ 87 (holding that "an adjudication order is final for purposes of appeal") (quotation simplified). The juvenile court properly considered Mother's post-adjudication motion to withdraw her no-contest response as a post-judgment motion to set aside the Adjudication Order. The court's denial of this motion, which was in essence a motion for relief from judgment pursuant to rule 60(b) of the Utah Rules of Civil Procedure, was itself a final, appealable order. *See Amica Mutual Ins. Co. v. Schettler*, 768 P.2d 950, 970 (Utah Ct. App. 1989) ("[A]n order denying relief under Rule 60(b) is a final appealable order."). Thus, the proper time to raise Counsel's alleged ineffective assistance would have been in an appeal from that ruling, made 15 days after the February 2, 2022 hearing in which the court denied Mother's motion. *See* Utah R. Juv. P. 52(a)(1); Utah R. App. P. 52(a). But Mother did not do so. Instead, she raised the issue in her notice of appeal from the Termination Order entered over a year later, in April 2023—well outside the 15-day window.

¶24    Mother's chance to raise this ineffective assistance claim came and went when she appealed neither the Adjudication

Order nor the denial of her post-judgment motion challenging the Adjudication Order. We therefore lack jurisdiction to address the claim here. *See In re R.P.*, 2024 UT App 106, ¶ 8 ("If an appeal is not timely filed, this court lacks jurisdiction over the issues raised.").

## II. Termination of Mother's Parental Rights

¶25 "A court may terminate parental rights only after making two necessary findings"—"first, the court must find, by clear and convincing evidence, that at least one statutory ground for termination exists," and "second, the court must find that termination of the parent's rights is in the best interest of the child." *In re J.P.*, 2021 UT App 134, ¶ 13, 502 P.3d 1247 (quotation simplified). Mother's challenge to the termination of her parental rights centers on the second part of this inquiry.

¶26 "Because any number of factors can have bearing on the child, the best-interest inquiry is a broad-ranging, holistic examination of all the relevant circumstances that might affect a child's situation." *Id.* ¶ 14 (quotation simplified). And termination must be "strictly necessary from the child's point of view." *Id.* ¶ 15 (quotation simplified). Our Supreme Court has instructed that the strictly necessary inquiry is part of the best-interest inquiry. *Id.* (citing *In re B.T.B.*, 2020 UT 60, ¶¶ 60, 76, 472 P.3d 827). "Termination is strictly necessary only when, after exploring possible placements for the child, the juvenile court concludes that no other feasible options exist that could address the specific problems or issues facing the family, short of imposing the ultimate remedy of terminating the parent's rights." *Id.* (quotation simplified). "Indeed, courts must start the best interest analysis from the legislatively mandated position that wherever possible, family life should be strengthened and preserved, and if the child can be equally protected and benefited by an option other than termination, termination is not strictly necessary." *In re J.J.W.*, 2022 UT App 116, ¶ 29, 520 P.3d 38 (quotation simplified).

¶27 Mother argues it was not strictly necessary to terminate her parental rights. She asserts that the court did not give due weight to DCFS's inadequate efforts to approve a kinship placement that could accommodate all four Children—namely, placing them with Grandmother. She also argues that the court failed to consider permanent guardianship with Grandmother or the Children's current placements as alternatives to termination. We address these arguments in turn.

A.    Kinship Placement

¶28 Under Utah Code section 80-4-104(12)(b)(ii), "[i]n determining whether termination is in the best interest of the child, and in finding, based on the totality of the circumstances, that termination of parental rights, from the child's point of view, is strictly necessary to promote the child's best interest, the juvenile court shall consider" whether "the efforts to place the child with a relative who has, or is willing to come forward to care for the child, were given due weight." Mother argues the court did not adhere to this statutory directive. In particular, she argues the court failed to consider DCFS's "botched" efforts to have Grandmother approved as a kinship placement. We disagree.

¶29 The juvenile court has "an obligation to consider proposed kinship placements, and if a court rejects a kinship placement, it must give reasons on the record for doing so." *In re B.W.*, 2022 UT App 131, ¶ 67, 521 P.3d 896, *cert. denied*, 525 P.3d 1269 (Utah 2023). "[A]lthough there's a statutory preference for kinship placements, and although courts must appropriately explore kinship placements as a result, courts that explore such options may then conclude, on the facts before them, that a different option is in fact in a child's best interest." *Id.* ¶ 68. "[I]f a court has complied with its statutory obligations, its resultant best interest determination is entitled to deference." *Id.* ¶ 69.

¶30 In the Termination Order, the court detailed the efforts DCFS made to submit an ICPC request for Grandmother, as well

as the many administrative errors that had occurred during the process. But regrettable though these missteps were, the court also made two pages of findings rejecting Grandmother as an appropriate kinship placement. The court noted Grandmother's lack of contact with the Children, DCFS, or the court, even after the ICPC request was delayed. And the court found that even if Grandmother's ICPC request had been approved, she only had one extra bedroom in her home and thus could only have been approved for two of the Children—not all four. Of particular concern, the court found that Grandmother "believes whatever the parents tell her" and that she had "bought into" Mother's and Father's "lies and paranoia" about DCFS to the detriment of her relationship with her son in Virginia and her relationship with J.M. and S.M. As summarized by the court, Grandmother testified at trial that "if the [C]hildren were placed with her, she would return" them to Mother and Father "when she thought it was appropriate." She also conspired to conceal the birth of the fifth child born during the pendency of this case to avoid DCFS involvement. In sum, the court concluded it could not "trust [Grandmother] to ensure the safety and protection of the [C]hildren."

¶31 After learning that Grandmother's ICPC request was still pending during the termination trial, the court "strongly considered" whether to stay the trial pending the ICPC decision. But the court ultimately decided against issuing a stay because (1) no party requested it and (2) in light of the above findings, "an approved ICPC would not change the Court's mind as to whether [Grandmother] would be an appropriate placement." The court acknowledged the statutory directive that "family members coming forward to provide placement for the [C]hildren" must "be given due weight." And the court did give due weight to a potential kinship placement with Grandmother—though it ultimately found the placement to be inappropriate. Thus, we cannot say that the court "failed to consider all of the facts or that it considered all of the facts and its decision was nonetheless

against the clear weight of the evidence." *In re B.W.,* 2022 UT App 131, ¶ 82, 521 P.3d 896 (quotation simplified).

B.    Permanent Guardianship

¶32    Mother also argues the court failed to consider permanent guardianship with Grandmother or with the Children's current placements as alternatives to termination of her parental rights. We disagree.

¶33    In the Termination Order, the court thoroughly considered kinship placement with Grandmother, concluding it was not appropriate and that Grandmother could not be trusted "to ensure the safety and protection of the [C]hildren." Because Grandmother had "bought into the lies and paranoia of the parents regarding DCFS"; had expressed regret over previously reporting the parents to DCFS; and had "testified that, if the [C]hildren were placed with her, she would return [them] to the parents when she thought it was appropriate," the court determined she was not an appropriate kinship placement and, thus, certainly not a suitable permanent guardian for the Children.

¶34    The court also considered whether permanent guardianship with the Children's then-current placements—J.M. and S.M. with family in Virginia and L.M. and J.A.M. with a foster family—could be an alternative to termination. With regard to J.M. and S.M., the court found that while their family placement was "more amenable to a non-termination option," from the point of view of the children, adoption was strictly necessary as the relationship between their paternal uncle's family and Mother and Father had "deteriorated to a point where they are not having contact." The court found J.M. and S.M. were "integrated into the family," called their foster parents "mom and dad," viewed their cousins as siblings, and considered them "their primary family."

¶35    With regard to L.M. and J.A.M., the court found permanent guardianship was not feasible as Mother and Father, "after many years of assistance, cannot adjust their circumstances to properly care for" them. The court noted that Mother and Father had "a lot of animosity" toward the foster parents, had threatened them with legal action, and had made statements that they would "get what is coming to them." The court found that Mother and Father had told L.M. and J.A.M. to expose the foster parents' "lies." The court further found that Mother and Father had complained multiple times about the Children calling their placements "mom and dad" and had "put their needs above the children's and consistently allowed this concern to get in the way of having productive visits with their children."

¶36    After considering permanent guardianship with both Grandmother and the Children's current placements, the court concluded that "no option satisfies the Children's need for safety, stability, and permanency more than adoption." Thus, we cannot say the court failed to consider permanent guardianship as an alternative to termination.

CONCLUSION

Because we lack jurisdiction over Mother's untimely ineffective assistance claim, we cannot address it. And we decline to overturn the juvenile court's determination that it was strictly necessary to terminate Mother's parental rights. Accordingly, we affirm.

———————