**2023 UT 4**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

TAYLOR LYNN SCOTT,
*Respondent,*

*v.*

SARAH CATHERINE BENSON,
*Petitioner.*

No. 20210922
Heard October 3, 2022
Filed April 20, 2023

On Certiorari to the Utah Court of Appeals

Third District, Salt Lake
The Honorable Richard D. McKelvie
No. 194903038

Attorneys:
Jeremy G. Jones, Jeffrey C. Jensen, Sandy, for respondent

Julie J. Nelson, Millcreek, Alexandra Mareschal, Salt Lake City,
for petitioner

ASSOCIATE CHIEF JUSTICE PEARCE authored the opinion of the Court in
which CHIEF JUSTICE DURRANT, JUSTICE PETERSEN, JUSTICE HAGEN, and
JUDGE REUBEN RENSTROM joined.

Having recused herself, JUSTICE POHLMAN did not participate;
DISTRICT COURT JUDGE REUBEN RENSTROM sat.

ASSOCIATE CHIEF JUSTICE PEARCE, opinion of the Court:

### INTRODUCTION

¶1 Utah law permits parents to establish the paternity of their child by signing and filing a voluntary declaration of paternity (VDP) with the Office of Vital Records and Statistics. UTAH CODE §§ 78B-15-301-302. Sarah Benson and Taylor Scott, an unmarried couple, signed a VDP in which they both represented that Scott was the father of Benson's child (Child). Problem was, Scott was not

Child's biological father, and both Scott and Benson knew that when they signed the VDP.[1]

¶2 After they submitted the VDP to the state, Benson continued to allow Scott to act as a father to Child, much as she had since Child's birth. But she eventually cut off contact between Scott and Child. Scott filed a complaint, asserting he was Child's father and asking the court for joint legal and physical custody. Benson challenged the VDP and asked the court to declare that Scott was not Child's father.

¶3 The district court applied the Utah Uniform Parentage Act and concluded that the VDP should be set aside because of the parties' fraud and a mutual mistake. *See id.* § 78B-15-307(1). But it also concluded that, under the Act, Scott should be adjudicated to be Child's father. *See id.* § 78B-15-608. Benson appealed, and the court of appeals affirmed.

¶4 Before us, Benson argues that the court of appeals misinterpreted the Act because once the district court concluded that the VDP was the product of fraud and mistake, the Act did not provide a path for Scott to continue to assert that he should be deemed to be Child's father.

¶5 We reject Benson's reading of the Act and affirm.

## BACKGROUND

¶6 Benson was pregnant with Child when she met and began dating Scott. Scott knew that Benson was pregnant with Child while they were dating and that he was not Child's biological father.

¶7 But Scott attended Child's birth and played a substantial role as a parental figure in Child's life for the next seven years. Child's biological father passed away shortly after Child's birth.

¶8 During their dating relationship, Benson became pregnant with Scott's biological child (Sibling). Before Sibling was born, Benson and Scott—who had never married—split up.

¶9 Because the couple never married, Utah law did not consider Scott to be Sibling's "presumed father." Benson initiated a paternity action, which established that Scott was Sibling's biological father.

---

[1] The record refers to the appellant as both Benson and Cooper—Cooper being the last name she took when she married. To remain consistent with the court of appeals' opinion, we refer to the appellant as Benson.

*See supra* ¶ 31 n.7. Scott and Benson settled that action by agreeing to sign a voluntary declaration of paternity (VDP)—in which Scott acknowledged that he was Sibling's father—and by obtaining an order that gave Scott joint custody of and required him to pay child support for Sibling.[2] Under their custody agreement, Scott enjoyed near-equal parent-time with Sibling.

¶10 Scott often cared for Child at the same time and in the same manner that he cared for Sibling. This pattern continued even after Scott married someone other than Benson.[3]

¶11 At some point, Benson was arrested and charged with driving under the influence. Benson pleaded guilty, and her driving privileges were suspended. For the next several months, Scott—at Benson's request—was the primary caregiver to both Child and Sibling.

¶12 Benson suffered from mental health issues during this period. She wanted a plan to ensure that both of her children would be cared for if she were no longer around. This thinking culminated in Scott and Benson signing and submitting a VDP that represented to the state that Scott was Child's biological father, even though both Scott and Benson knew that representation was false. The Office of Vital Records updated Child's birth certificate to reflect Scott's paternity.

---

[2] Utah Code section 78B-15-301 creates and authorizes the use of VDPs. Utah law permits the "mother of a child and a man claiming to be the genetic father of the child . . . [to] sign a declaration of paternity to establish the paternity of the child." *Id.* The VDP must be signed or authenticated "under penalty of perjury, by the mother and by the declarant father." *Id.* § 78B-15-302(1)(b). By signing, the mother and declarant father aver that "the child whose paternity is being declared: (i) does not have a presumed father, or has a presumed father whose full name is stated; and (ii) does not have another declarant or adjudicated father." *Id.* § 78B-15-302(1)(d). The VDP is effective once it is "filed and entered into a database established and maintained by the Office of Vital Records." *Id.* § 78B-15-302(9).

[3] Benson and Scott disagree on the extent to which Scott had equal parenting time with both Sibling and Child, but Benson's brief concedes that Scott "continued to have a relationship with Child."

¶13 For a year or so after signing the VDP, Scott and Benson maintained contact and shared parenting responsibilities for both children. Eventually Benson—who had married and whose husband wanted to adopt Child—cut off contact between Scott and Child.

¶14 Scott filed a paternity action, seeking to be declared Child's legal father and asking for joint legal and physical custody of Child. Benson counter-petitioned, challenging Scott's paternity and asking to have the VDP set aside.

¶15 The district court treated Benson's counter-petition as an action to invalidate the VDP under the Utah Uniform Parentage Act. The Act provides that a VDP can be challenged because of fraud, duress, or material mistake of fact. UTAH CODE § 78B-15-307. Benson also filed a motion asking the court to compel Scott to submit to genetic testing, which she asserted would demonstrate that Scott was not Child's biological father.

¶16 Scott agreed that a genetic test would prove he was not Child's biological father, and the parties stipulated to that fact. But Scott asked the court to disregard the biological reality under section 608 of the Act—a provision that allows a court to disregard genetic test results in certain circumstances.[4]

¶17 Benson moved for summary judgment and asked the court to set aside the VDP because the parties had made a "material mistake of fact," a term statutorily defined to include situations in which "genetic test results . . . exclude a declarant father." *Id.* § 78B-15-307(5). Benson's motion also asked the court to find that Scott and Child did not have a father-child relationship because the VDP had been "successfully challenged."

¶18 The court denied the motion, reasoning that, even though genetic test results would show Scott was not Child's father, there was no "mistake" because both parties knew Scott was not Child's

---

[4] Under section 608, a court can disregard genetic test results that exclude a declarant father from genetic parentage if the behavior of one of the VDP signatories estops that party from denying parentage and if disrupting the child and declarant-father relationship would be inequitable. *Id.* § 78B-15-608(1). When a court decides whether to ignore genetic testing, the Act instructs it to focus on the child's best interest by examining several factors, including the bond between the declarant father and child, and the potential harm to a child if paternity is disestablished. *Id.* § 78B-15-608(2).

biological father when they signed the VDP, and because they "chose at the time to jointly raise a child."

¶19 After denying Benson's summary judgment motion, the court held a three-day evidentiary hearing. The district court found that Scott and his witnesses were "generally credible" and that Scott's description of his relationship with Child was "particularly credible." The court found that Benson's own testimony was also "generally credible" but rejected her testimony regarding some aspects of Scott and Child's relationship.

¶20 The district court reversed the reasoning it had employed to deny summary judgment and concluded that the parties had been operating under a "material mistake of fact" when they signed the VDP. The court also found that Scott and Benson did not defraud each other but that the VDP was still the product of fraud because it committed "fraud against the Utah State Division of Vital Statistics." The district court determined that the VDP should be set aside and that it was void *ab initio* and had "no legal force or effect."

¶21 The district court also accepted the parties' stipulation that Scott was not Child's biological father as the "genetic testing" the Act references. The district court also accepted that this "testing" confirmed Scott was not Child's biological father.[5]

¶22 But the district court ultimately determined that Scott was Child's legal father, reasoning that its conclusion that the VDP should be set aside "draws the court to [section 608]." The court determined that Benson's conduct estopped her from denying Scott's parentage and that it would be inequitable to disrupt Scott and Child's relationship. The district court also concluded that, after a review of the factors in section 608, it was in Child's best interest for Scott to be Child's legal father. The court found that Scott "played a substantial role in [Child's] life for the first seven years of [Child's] life, and that role was involuntarily terminated" by Benson. The

---

[5] The Act provides a detailed description of what constitutes genetic testing. *See id.* § 78B-15-102(13). Notably, that definition does not include a stipulation concerning what the genetic tests would show had a test been performed. The district court nevertheless concluded: "Genetic testing has confirmed that Petitioner is not the biological father of [Child]." This conclusion was not directly challenged on appeal, so we do not address it further other than to emphasize that we explicitly offer no opinion on whether a stipulation can be the genetic testing the Act contemplates.

court also found that "[t]here is and has been a strong bond and attachment between [Scott] and [Child], and there has been since [Child's] birth."

¶23 Benson appealed to the court of appeals, which upheld the district court's ruling. *Scott v. Benson*, 2021 UT App 110, ¶ 1, 501 P.3d 1148. Like the district court, the court of appeals concluded that Scott was Child's legal father even though Benson successfully challenged the VDP under section 307 of the Act. *See id.* ¶¶ 31–32. But, unlike the district court, the court of appeals reasoned that a successful 307 challenge did not render the VDP void from its inception. *Id.* ¶ 40. The court of appeals instead held that a successful 307 challenge meant that a VDP could be "set aside, on a going-forward basis," but only as long as section 608 "does not counsel otherwise." *Id.* And it concluded that section 608 did not demand a different conclusion than the one the district court reached. *See id.* ¶¶ 40, 43.

¶24 Benson petitioned for certiorari review contending that the court of appeals misinterpreted the Act.

**STANDARD OF REVIEW**

¶25 "We review questions of statutory interpretation for correctness, affording no deference to the lower court's legal conclusions." *Cardiff Wales, LLC v. Washington Cnty. Sch. Dist.*, 2022 UT 19, ¶ 16, 511 P.3d 1155 (cleaned up).

**ANALYSIS**

¶26 Benson first claims that the court of appeals wrongly opined that the Act permitted the district court to conduct a section 608 analysis after it concluded that the VDP was fraudulent and based on a material mistake of fact. According to Benson, the court of appeals erred because once a VDP is successfully challenged, the court's analysis should end in favor of the challenger. Benson also claims that the court of appeals' interpretation of the statute raises constitutional issues, leads to absurd results, and promotes bad policy.

I. THE COURT OF APPEALS DID NOT ERR WHEN IT APPLIED
SECTION 608 TO DISREGARD THE GENETIC TEST RESULTS

*A. The Court of Appeals Correctly Upheld the District Court's
Decision to Apply Section 608*

¶27 Benson first argues the court of appeals incorrectly upheld the district court's decision to set aside the genetic test results that

showed that Scott was not Child's biological father.[6] Benson argues that section 608 "does not apply to every proceeding commenced under 307" and that, in this case, section 608 "has no application that is consistent with the language of the statute."

¶28  The Act outlines two ways a VDP can be set aside. It allows either of the signatories to rescind a VDP by filing a voluntary rescission within sixty days of the date the VDP became effective or before "the date of notice of the first adjudicative proceeding to which the signatory is a party, before a tribunal to adjudicate an issue relating to the child, including a proceeding that establishes support," whichever is earlier. UTAH CODE § 78B-15-306(1). If neither signatory rescinds the VDP—as in this case—they must look to section 307 to challenge the VDP.

¶29 Section 307 provides:

> After the period for rescission . . . has expired, a signatory of a declaration of paternity or denial of paternity, or a support-enforcement agency, may commence a proceeding to challenge the declaration or denial only on the basis of fraud, duress, or material mistake of fact.

*Id.* § 78B-15-307(1).

¶30  In other words, after the VDP has been signed, either of the signatories can rescind it before the earliest of sixty days or notice of an adjudicative proceeding. *Id.* § 78B-15-306(1). After the statutory rescission period passes, either a signatory or a support-enforcement agency can challenge the validity of the VDP. This challenge can be based on fraud, duress, or material mistake of fact. *Id.* § 78B-15-307(1). A challenge based on fraud or duress can be brought at any time. *Id.* § 78B-15-307(3). A challenge based on material mistake of

---

[6] Benson also argues that genetic tests were unnecessary because the parties agreed Scott was not Child's biological father, so section 608, which only allows the court to set aside genetic testing (or deny a motion for testing), does not apply. But Benson does not directly challenge the district court's conclusion that the stipulation qualifies as genetic testing for the purposes of section 608. Because Benson has not mounted a challenge to the district court's conclusion, we accept, without comment, the district court's decision that the stipulation was the equivalent of a genetic test. *See supra* ¶ 21 n.5.

fact can only be brought within four years after the declaration is filed. *Id.* § 78B-15-307(4).

¶31 The Act also contemplates that, in some situations, a court can ignore genetic test results when determining paternity. *Id.* § 78B-15-608. Section 608 permits the district court to do this when "the conduct of the mother or the presumed or declarant father estops that party from denying parentage" and "it would be inequitable to disrupt the father-child relationship between the child and the presumed or declarant father." *Id.* § 78B-15-608(1).[7]

¶32 Subsection 608(2) outlines factors a court must consider to determine whether disregarding test results is in the best interest of the child. These factors include how long a presumed or declarant father acted as a child's father, the nature of the relationship between the child and potential father, and harm to the child if the relationship between the child and potential father is disrupted.[8]

---

[7] A "presumed father" must be someone who, at one point, was married to the mother. *See id.* § 78B-15-204(1) (defining when a man is a presumed father). Because Benson and Scott were never married, Scott is not and never was Child's presumed father.

[8] The full list of factors is

    (a) the length of time between the proceeding to adjudicate parentage and the time that the presumed or declarant father was placed on notice that he might not be the genetic father;
    (b) the length of time during which the presumed or declarant father has assumed the role of father of the child;
    (c) the facts surrounding the presumed or declarant father's discovery of his possible nonpaternity;
    (d) the nature of the relationship between the child and the presumed or declarant father;
    (e) the age of the child;
    (f) the harm that may result to the child if presumed or declared paternity is successfully disestablished;
    (g) the nature of the relationship between the child and any alleged father;
    (h) the extent to which the passage of time reduces the chances of establishing the paternity of another man

(continued . . .)

¶33 Benson argues that the court of appeals misread the statute when it endorsed the district court's decision to conduct the section 608 analysis after it set aside the VDP under section 307. She claims that genetic testing, and therefore section 608, is "irrelevant" to this inquiry "because the ground to set aside the VDP was already established: fraud." In Benson's view, the district court starts with the section 307 inquiry and cannot look to section 608 if the court finds that the VDP is the product of fraud, duress, or mistake of fact.

¶34 The court of appeals disagreed with Benson's argument and held that the district court appropriately applied section 608 because, while other provisions of the Act state when the VDP should be considered "invalid from its inception," section 307 does not. *Scott v. Benson*, 2021 UT App 110, ¶¶ 34, 37–38, 501 P.3d 1148. The court of appeals concluded the central question was about "the consequence of a successful Section 307 challenge." *Id.* ¶ 36. The court of appeals determined that "the Act's silence on this point must be viewed in tandem with the specific instructions" given for successfully voiding or rescinding a VDP in other sections of the Act. *Id.* ¶ 38.

¶35 The court of appeals reasoned that "there is no statutory basis for concluding that a declaration of paternity is void simply because a Section 307 challenge is successful." *Id.* ¶ 32. The court of appeals therefore concluded that a district court may look to section 608 to decide whether to disregard genetic testing even after the district court finds a ground to set the VDP aside under section 307.

¶36 In other words, the court of appeals sees the process to challenge a VDP as requiring two steps. In the first step, the district court examines the VDP under section 307 and determines if a challenge to its validity is successful. *Id.* ¶ 40. If the challenge is successful, the district court moves to step two and applies section 608 to assess whether principles of equity and estoppel should prevent the court from allowing the declaration to "be set aside, on a going-forward basis." *Id.* Benson also appears to see this as a two-

---

    and a child-support obligation in favor of the child; and

    (i) other factors that may affect the equities arising from the disruption of the father-child relationship between the child and the presumed or declarant father or the chance of other harm to the child.

*Id.* § 78B-15-608(2).

step process, but she reads the Act to end the inquiry after the first step if the section 307 challenge is successful.

¶37 The aim of statutory interpretation "is to ascertain the intent of the legislature," and the "best evidence of the legislature's intent is the plain language of the statute itself." *Castro v. Lemus*, 2019 UT 71, ¶ 17, 456 P.3d 750 (cleaned up). We "read the plain language of the statute as a whole, and interpret its provisions in harmony with other statutes in the same chapter and related chapters." *State v. Barrett*, 2005 UT 88, ¶ 29, 127 P.3d 682 (cleaned up). Occasionally, "statutory text may not be plain when read in isolation, but may become so in light of its linguistic, structural, and statutory context." *Bryner v. Cardon Outreach, LLC*, 2018 UT 52, ¶ 12, 428 P.3d 1096 (cleaned up).

¶38 When we read the statute's plain language, we see a different structure than Benson and the court of appeals did. The Act does not contemplate the sequential inquiry that the court of appeals describes and that Benson wants. Rather, when a party challenges a VDP, the Legislature intends that, in appropriate cases, the section 608 factors be considered as part of the question of whether the VDP should be invalidated.

¶39 Section 308, titled "Procedure for rescission or challenge," sets forth the procedure a court must employ to decide whether to set aside a VDP. UTAH CODE § 78B-15-308. Among the instructions section 308 provides to the district court is the mandate that a "proceeding to rescind or to challenge a declaration of paternity or denial of paternity must be conducted *in the same manner* as a proceeding to adjudicate parentage under Part 6, Adjudication of Parentage." *Id.* § 78B-15-308(4) (emphasis added).

¶40 This means that when Benson challenged the VDP under section 307, the procedure to challenge the VDP had to be conducted in the same manner as adjudication of parentage under Part 6.[9] And,

---

[9] Although Benson sometimes references "section 307" in her briefs, it bears noting that section 307 does not outline what a party must show to successfully challenge a VDP. Rather, section 307 details the circumstances in which a party can bring a challenge after the sixty-day period has expired. *Id.* § 78B-15-307. Section 308 contains the Legislature's instructions on how to proceed with a VDP challenge, and that section directs a court to proceed in the same manner as any other adjudication of parentage under Part 6.

under Part 6, section 608, a district court can ignore genetic test results in appropriate circumstances. Thus, by section 308's plain language, the court must follow the procedures of Part 6, which, in appropriate cases, incorporates the section 608 analysis into a proceeding challenging a VDP's validity. This causes us to read the statute as calling for a single-step rather than a two-step inquiry.[10]

¶41 This reading resolves the first problem that Benson identifies. Benson claims that the district court erred (and the court of appeals erred in blessing the district court's decision) because it looked to section 608's factors after it concluded that the VDP was the product of mutual mistake and fraud on the state. Benson claims that the district court should not have moved to "step two" (a section 608 analysis), because the inquiry ended after "step one" (a conclusion under section 307 that the VDP was the product of fraud and mutual mistake).[11]

¶42 That problem does not arise when the statute is read correctly. A district court conducts a proceeding on a section 307

---

[10] It is not difficult to envision why the Legislature would structure the statute this way. In many—if not most—cases, a party will use genetic test results to prove the fraud or mutual mistake of fact that could be used to set aside the VDP.

[11] The court of appeals also opined that a successfully challenged VDP "is subject to being declared ineffective on a forward-looking basis." *Scott*, 2021 UT App 110, ¶ 31. The Act itself is largely silent on the effects of setting aside a VDP. We know that the Legislature told us that a declarant father whose VDP is rescinded cannot claw back child support he paid. *See* UTAH CODE § 78B-15-308(6) ("If the declaration is rescinded, the declarant father may not recover child support he paid prior to the entry of an order of rescission."). And we know that the Legislature has declared that at "the conclusion of a proceeding to rescind or challenge a declaration of paternity, . . . the [court] shall order the Office of Vital Records to amend the birth record of the child, if appropriate." *Id.* § 78B-15-308(5). But the Act does not tell us what other consequences might flow from setting a VDP aside. Since we don't need to answer that question to resolve this case, we vacate the court of appeals' conclusion that a successfully challenged VDP may be "ineffective on a forward-looking basis." *See Scott*, 2021 UT App 110, ¶ 31. And we leave the question for a case where that determination matters to the outcome and is specifically briefed.

challenge in the same manner it conducts a proceeding on a challenge to paternity. Thus, in a proceeding challenging a VDP, the court can consider whether or not to set aside genetic testing based on the factors in section 608, just as it could in a proceeding to challenge paternity.[12]

### B. Benson's Argument that the Court of Appeals' Reading Creates a Conflict with Other Provisions of the Act Is Unavailing

¶43 Benson next argues that the court of appeals erred because its reading of the statute creates a conflict between section 608 and section 617.[13]

---

[12] Benson also argues that the district court erred when it applied section 608 because that section applies to declarant fathers, and "[o]nce the court granted [Benson's section 307] challenge, Child was no longer a child 'having a declarant father.'" Benson additionally claims that Scott was not a declarant father because subsection 201(2) of the Act, the provision on father-child relationships, means a successful VDP challenge disestablishes a father-child relationship. UTAH CODE § 78B-15-201(2). As we have explained, if the section 307 challenge is conducted in the same manner as a paternity determination—as the statute requires—the district court applies section 608 as part of the determination to set the VDP aside. And someone in Scott's position does not lose his declarant father status unless the court invalidates the VDP.

[13] Benson also argues that the court of appeals erred because the Act should be interpreted in light of the Act's purported purpose—favoring the recognition of genetic parentage. Benson argues that the court of appeals' interpretation of the statute "which would allow the signatory to a successfully challenged VDP to nonetheless rely on section 608, undermines the purposes and policies that form the basis of the comprehensive statutory scheme." But we don't normally interpret the statute in light of its supposed purpose when the plain text tells us how the Legislature intended the statute to operate. *See Zilleruelo v. Commodity Transporters, Inc.*, 2022 UT 1, ¶ 31, 506 P.3d 509 ("In general, where a statute's language is unambiguous and provides a workable result, we need not resort to other interpretive tools, and our analysis ends." (cleaned up)). Sticking to the text helps us avoid "the peril of interpreting statutes in accordance with presumed legislative purpose" as "most statutes represent a compromise of purposes advanced by competing interest groups, not an unmitigated attempt to stamp out a particular evil."

(continued . . .)

¶44  Section 617 states:

> The tribunal shall apply the following rules to adjudicate the paternity of a child:
>
> (1) The paternity of a child having a presumed, declarant, or adjudicated father may be disproved only by admissible results of genetic testing excluding that man as the father of the child or identifying another man as the father of the child.
>
> (2) Unless the results of genetic testing are admitted to rebut other results of genetic testing, a man identified as the father of a child under Section 78B-15-505 must be adjudicated the father of the child, unless an exception is granted under Section 78B-15-608.
>
> . . . .
>
> (4) Unless the results of genetic testing are admitted to rebut other results of genetic testing, a man properly excluded as the father of a child by genetic testing must be adjudicated not to be the father of the child.

UTAH CODE § 78B-15-617.

¶45  Benson argues that Scott was "properly excluded" as Child's father and therefore must "be adjudicated not to be the father of the child" without the section 608 analysis, because subsection 617(2) mentions section 608, and subsection 617(4) does not. *Id.* § 78B-15-617.

¶46  The court of appeals "acknowledge[d] the apparent inconsistency between subsections (2) and (4) of Section 617," but held that, if they followed Benson's interpretation, "Section 608—which exists only to give courts an opportunity to disregard genetic evidence in appropriate circumstances—would be effectively excised from the Act." *Scott*, 2021 UT App 110, ¶ 38 n.9. Because the court did "not perceive therein a legislative intent to abrogate Section 608," it held that Benson's reading was unpersuasive. *Id.*

¶47  We see neither the conflict Benson perceives nor the inconsistency the court of appeals described. Section 617(2) refers to

---

*Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 23 n.6, 248 P.3d 465. Thus, in a case like this, where the statutory language is plain, we have no need to start poking around the statute's purposes in hopes of finding a gloss to put on the text.

"a man identified as the father" and requires that a man whom genetic testing identifies as the father must be adjudicated the father unless the district court disregards the test results under section 608. UTAH CODE § 78B-15-617(2).

¶48 Section 617(4) refers to a man "properly excluded as the father of a child by genetic testing." *Id.* § 78B-15-617(4). That subsection also provides that a man properly excluded by genetic testing must be adjudicated to not be the father. *Id.* Although subsection 617(4) does not explicitly reference section 608, it does so implicitly by referring to a man "properly excluded" by genetic testing. A man is not "properly excluded" by genetic testing if the district court disregards that testing under section 608.

¶49 Here, Scott was identified as the non-genetic father. But he was not "properly excluded as the father" of Child because the genetic testing in this case was set aside as the statute contemplates. There is no conflict between sections 608 and 617.

## II. BENSON'S CONSTITUTIONALITY, ABSURDITY, AND PUBLIC POLICY ARGUMENTS DO NOT DICTATE A DIFFERENT RESULT

¶50 For her next set of arguments, Benson strays from the text and contends that we should reject the court of appeals' interpretation because it raises constitutional issues, leads to absurd results, and is contrary to public policy.

### A. Benson Has Not Demonstrated that the Court of Appeals' Reading of the Statute Raises Constitutional Concerns That Require a Different Interpretation

¶51 Benson contends that the court of appeals interpreted the Act in a way that raises constitutional concerns. She further argues that the court of appeals' reading of section 608 is one that "allows a legal and genetic stranger to take advantage of its provisions" and thus "diminish[es] a mother's fundamental right to 'direct the upbringing of [her] children,'" (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Benson asserts that we should apply the constitutional avoidance canon and reverse the court of appeals.

¶52 The constitutional avoidance canon permits a court to "reject[] one of two plausible constructions of a statute on the ground that [one interpretation] would raise grave doubts as to [the statute's] constitutionality." *Utah Dep't of Transp. v. Carlson*, 2014 UT 24, ¶ 23, 332 P.3d 900. But when we can, we "decide cases on the preferred grounds of statutory construction, thereby avoiding

analysis of underlying constitutional issues unless required to do so." *Id.* ¶ 24 (cleaned up).

¶53  Moreover, we do not usually invoke the canon just because we have "*doubts* about the constitutionality" of a statute. *Id.* ¶ 25. Nor can we use the canon to "break faith with the statute's text" and "rewrite the statute" to save an unconstitutional statute. *State v. Garcia*, 2017 UT 53, ¶ 59, 424 P.3d 171. We simply recognize that where there are two plausible constructions of a statute, and one steers clear of constitutional problems, we presume that the Legislature intended to enact the constitutional interpretation.[14] *See Carlson*, 2014 UT 24, ¶ 23.

¶54  We take Benson's point that the Act has the potential to tread into constitutional territory. This court has recognized that "parents have a fundamental right to make decisions concerning the care and control of their children." *Jensen ex rel. Jensen v. Cunningham*, 2011 UT 17, ¶ 73, 250 P.3d 465. Section 608, in which the Legislature provides a path to declare a person who is not genetically related to the child a parent, has the potential to compromise the genetic parent's constitutional right.

¶55  But Benson does not offer us a plausible reading of the Act that avoids the potential constitutional concern. Instead, Benson's proffered solution is to read the Act so that section 608 does not apply to most non-biological fathers. This would require us to rewrite the statute, something that we cannot do.

¶56  Where Benson cannot offer a plausible interpretation of the text that avoids the constitutional concern, Benson's obligation is to demonstrate that the statute is unconstitutional. Benson has not made that argument.

¶57  That is not to say that we do not understand Benson's concern. The Act allows someone who is not a genetic parent to gain parental rights and to potentially exercise them at the expense of the genetic parent's rights. But Benson does not explain how, under the circumstance before us, this would violate her constitutional rights.

---

[14] In *State v. Garcia*, for example, we employed the canon to choose between two interpretations of "unlawful user" in determining how to read a statute. We chose the interpretation that "comport[ed] better with the statute's text" because following the text of the statute best "preserve[d] the legislative intent." *Garcia,* 2017 UT 53, ¶ 61.

She does not discuss the impact of her own role in seeking to defraud the State by conspiring to sign a VDP she knew was inaccurate. Nor has she analyzed the impact on her parental rights of permitting Scott to exercise parental-like rights for a number of years. Nor has she explained the impact of the district court's unchallenged finding that it was in Child's best interest to not set the VDP aside.

¶58 With neither a plausible interpretation of the statute that both adheres to the text and avoids the constitutional concerns, nor briefing aimed at demonstrating that sections of the Act should be struck as unconstitutional, we reject Benson's challenges.

*B. The Court of Appeals' Interpretation Does Not Lead to Absurd Results in This Case*

¶59 Benson asks us to employ the absurd consequences canon to overturn the court of appeals' interpretation of the statute. According to Benson, holding that Scott was the "declarant father," after the district court found the VDP was successfully challenged, leads to absurd results. As an initial matter, for the reasons we outline above, we do not agree that the VDP was "successfully challenged." But even assuming we could accept that premise, the absurd consequences canon does not require a different interpretation. Benson claims, by way of example, that it would be absurd for a woman who was coerced into signing a VDP to have to endure a section 608 analysis where a district court would consider whether it was in the best interests of her child to set aside the VDP she was coerced to sign.

¶60 The absurd consequences canon allows us to "resolve an ambiguity by choosing the reading that avoids absurd results when statutory language plausibly presents us with two alternative readings." *Utley v. Mill Man Steel, Inc.*, 2015 UT 75, ¶ 47, 357 P.3d 992 (Durrant, C. J., concurring in part on behalf of the majority) (cleaned up). We conclude that statutory language yields absurd results when those results are "so overwhelmingly absurd no rational legislator could have intended them." *Id.* ¶ 46.

¶61 Even if we can conceive of scenarios where the statute the Legislature enacted might produce an absurd result, we do not stray from the statute's text in a case where the application of the Act in the case before us does not lead to an absurd result. *See, e.g., State v. Sanders*, 2019 UT 25, ¶ 54 n.13, 445 P.3d 453.

¶62 In *Sanders*, for example, we upheld Sanders' conviction for illegal possession of a firearm. *Id.* ¶ 2. Sanders argued that the State's

proffered statutory construction—which did not leave room for an innocent possession defense—was absurd because there were circumstances where the application of that construction could yield an absurd result. *Id.* ¶ 51. We agreed with Sanders that it was "not difficult to conceive of factual scenarios where the lack of an innocent possession defense might lead to an absurd result," such as a felon taking a gun from a toddler to place it safely out of reach. *Id.* ¶ 54. But the potential for an absurd result in a hypothetical case did not help Sanders, because this was "not the case before us." *Id.* Sanders' arguments were unavailing because they did not demonstrate absurd legislative policy or "that the application of that policy to [Sanders], under the circumstances presented [in that case], yielded an absurd result." *Id.* ¶ 51.

¶63 As in *Sanders*, Benson does not meet her burden of demonstrating that the court of appeals' statutory interpretation led to absurd results in her case. A rational legislature could have intended the result the district court ordered. At least, Benson has not convinced us that a rational legislature could not have intended that the district court look to the real-world effects on Child if it divested Scott of the parental relationship Benson had allowed to grow.

### C. Benson's Policy Arguments Do Not Allow Us to Ignore or Modify the Statute's Text

¶64 Benson also advances policy arguments to support a different reading of the Act. Benson claims that conducting a section 608 analysis after a VDP is successfully challenged ignores "a statutory preference for genetic paternity" and would thereby "undermine[] the purposes and policies that form the basis of the comprehensive statutory scheme."[15] She also claims this interpretation would encourage fraudulent VDPs, possibly at the expense of biological fathers.

¶65 When we can glean the Legislature's intent from the statute's text, we have no reason to entertain arguments that we might be able to enact better policy by placing judicial glosses on the text. We have advised that "[w]here the legislature has spoken[,] our role is limited. In the face of duly-enacted legislation we no longer have a primary policymaking role. We are left only to interpret the

---

[15] We again note that we do not agree with Benson that the VDP had been "successfully challenged." We nevertheless engage with the substance of her arguments.

terms of the statute and then to implement them." *M.J. v. Wisan*, 2016 UT 13, ¶ 69, 371 P.3d 21 (cleaned up). Benson may have legitimate policy concerns and may even be able to articulate a statutory scheme that better promotes public policy than the one on the books. But "we have repeatedly declined invitations to interpret statutes contrary to their plain language even when a party offers an interpretation that might better advance the Legislature's purpose." *Zilleruelo v. Commodity Transporters, Inc.*, 2022 UT 1, ¶ 40, 506 P.3d 509. We do so again.

## CONCLUSION

¶66 The court of appeals correctly concluded that the district court did not err when it looked to the factors in Utah Code section 78B-16-608 to disregard the genetic test results that would have excluded Scott as Child's father.

¶67 We affirm the court of appeals' decision and remand the case to the district court for further proceedings.

———————